IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDERNESS WATCH, | CV 23–133–M–DLC–KLD |
| Plaintiff, | |
| vs. | |
| UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

Plaintiff Wilderness Watch brought this lawsuit against Defendant United States Forest Service ("USFS"), challenging USFS' approval of the Buffalo Creek Yellowstone Cutthroat Trout Conservation Project ("the Project") in the Custer Gallatin National Forest and Absaroka-Beartooth Wilderness. Wilderness Watch argues USFS' approval of the project was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the Wilderness Act. Pending before the Court is Wilderness Watch's Motion for Summary Judgment (Doc. 15) and USFS' Cross-Motion for Summary Judgment (Doc. 20). The Court held oral argument on the motions on December 18, 2024. For the reasons set forth below, the Court recommends USFS' motion be granted and Wilderness Watch's motion be denied.

1

I.    **Background**

Wilderness Watch is a non-profit environmental conservation organization headquartered in Missoula, Montana. USFS is a federal agency of the Department of Agriculture. USFS manages the Custer Gallatin National Forest in south-western Montana. USFS also manages the Absaroka-Beartooth Wilderness, located within the Custer Gallatin Nation Forest. The Absaroka-Beartooth Wilderness spans nearly 950,000 acres. Congress designated the Absaroka-Beartooth Wilderness in 1978 and expanded it to its current size in 1984. (AR015585; AR016295).

The National Wilderness Preservation system was established by Congress in the Wilderness Act of 1964, under which Congress may designate federally protected wilderness areas. 16 U.S.C. § 1131 *et seq*. Unlike other public-lands designations, such as national forests or parks, the management of wilderness areas is not designated to a particular agency. Rather, management falls to the agency responsible for the public lands from which the wilderness was created.

Yellowstone National Park is located immediately south of the Absaroka-Beartooth Wilderness. Flowing generally northwest, the Lamar River runs through the northeast corner of the park before emptying into the Yellowstone River. The facts of this case largely concern Buffalo Creek, a tributary of the Lamar River. Buffalo Creek originates in the Absaroka-Beartooth Wilderness and flows south

2

into Yellowstone National Park. Before meeting the Lamar River, Buffalo Creek empties into Slough Creek. (AR002597).

Upstream of its confluence with Slough Creek, Buffalo Creek flows over a "barrier cascade," which prevents upstream migration of fish. (AR002606). This feature is at the boundary between the Absaroka-Beartooth Wilderness and Yellowstone National Park. (AR002606). The Buffalo Creek sub-watershed also includes the 9-acre Hidden Lake, a smaller .6-acre lake, and approximately 26 acres of other standing waters impounded behind beaver dams. (AR002623-24).

The Lamar River watershed is noted as important habitat for Yellowstone Cutthroat Trout ("YCT"). YCT is a species of trout native to Montana, Wyoming, Idaho, Nevada, and Utah. (AR014723). While YCT is not listed as an endangered species, state and federal agencies participate in programs and agreements to conserve and restore the species. USFS has entered into several inter-agency agreements to that end. (AR014826-39; AR007434-40).

Habitat changes and the introduction of nonnative fish have contributed to the decline of YCT population and a constriction of the species' geographic range. (AR002604-05). Overall, YCT currently occupy only 44% of their historic range. (AR002604). Genetic hybridization poses a key threat to the persistence of YCT. (AR002605). In this context, hybridization occurs when non-native rainbow trout

interbreed with YCT. Other threats to the persistence of YCT include habitat loss and climate change. (AR002606).

YCT are native to the lower reaches of Buffalo Creek. (AR002596). However, records indicate Buffalo Creek was fishless above the barrier cascade at the time of European colonization. (AR002606). Buffalo Creek presumably remained fishless above the barrier cascade until YCT were stocked there in the 1920s and in 1942. (AR002606). In 1932, rainbow trout were also stocked above the barrier cascade. (AR002606). Unlike YCT, rainbow trout are not native to any part of Buffalo Creek or the Lamar River Watershed. (AR002799). Fish surveys conducted by Montana Fish Wildlife and Parks ("FWP") and USFS indicate only rainbow trout—and not YCT—are currently found above the barrier cascade. (AR002606).

Although the barrier cascade prevents the upstream travel of fish, it does not prevent fish from travelling downstream towards Slough Creek and the Lamar River. Given its established population of rainbow trout, Buffalo Creek is the "primary source of hybridization in the Lamar River watershed." (AR002603). Further, "spatial patterns of invasion point to Buffalo Creek as the single contemporary source of rainbow trout in the (Lamar) Watershed." (AR002611 (quoting AR010006)).

In light of these facts, the USFS approved the Buffalo Creek Yellowstone Cutthroat Trout Conservation Project ("the Project") in August, 2023. (AR002815). The Project involves a collaboration between FWP, USFS and the National Park Service. (AR002598). The Final Environmental Assessment ("FEA") for the Project was prepared by FWP. According to the FEA, the Project serves multiple, interrelated goals. "The primary goal of this project is to remove rainbow trout from the Bufalo Creek watershed, which would protect the genetic integrity of Yellowstone cutthroat trout in the Lamar River basin while improving the natural quality of wilderness character . . . ." (AR002597).

A secondary benefit of the Project is to establish a secure population of genetically pure YCT above the barrier cascade. (AR002598). The stream miles above the cascade are likely to provide better and more secure habitat for YCT in the face of climate change. (AR002667). Although restocking Buffalo Creek with YCT after eradicating rainbow trout is a clear priority of the project, the FEA states that restocking YCT in wilderness areas by FWP is "outside the scope of Forest Service Decision" and is separately authorized in other, preexisting agreements. (AR002678).

As authorized in the Project, rainbow trout in the Buffalo Creek subwatershed would be eradicated via the application of rotenone. (AR002603). Rotenone is a naturally derived piscicide that has been used in similar projects.

(AR002621). In moving water, rotenone application would require the use of "drip stations" and other measures to ensure that the concentration was no greater than necessary to eradicate rainbow trout. (AR002623). In lakes and standing water, the Project calls for more complicated systems of application, including mechanical transport, generators, and pumps. Aircraft would be used to spray 25 acres of open water. Depending on algae conditions, inflatable motorized watercraft could be deployed on Hidden Lake to "break paths through the thick algae." (AR002623-24; AR002825). Pumps and generators would be used to supplement aerial spraying where necessary. (AR002825). In addition, the Project calls for one or two temporary barriers to be installed on the stream flowing out of Hidden Lake. These barriers would prevent rainbow trout from re-colonizing areas where they had been eradicated during earlier phases of the Project. (AR002824-25).

The Project also calls for the use of a helicopter to transport personnel and equipment and the erection of a radio repeater to be used during project activity. (AR002823-25). Project activities would occur over two to five years, depending on monitoring results. (AR0028290; AR002829). In total, the Project authorizes up to 60 days of motorized use and up to 81 aircraft landings in wilderness. (AR002826).

The Final Decision Notice for the Project indicates the Project is "limited to the authorization of piscicide application within the wilderness and the use of

6

motorized and mechanized equipment and transport." (AR002818). As above, YCT restocking by FWP is apparently authorized in other agreements. For example, USFS and FWP are signatories to the 2010 Cooperative Agreement for Fish, Wildlife and Habitat Management on National Forest Wilderness Lands in Montana. (AR015815). That agreement authorizes FWP to stock fish in designated wilderness to "reestablish or maintain indigenous species" or introduced species managed as indigenous species. (AR015827).

        As part of the decision-making process, USFS and FWP prepared a Minimum Requirements Decision Guide ("MRDG") for the Project. (AR003841). "The MRDG is a process to identify, analyze, and recommend management actions that are the minimum necessary for wilderness administration." (AR002798). The MRDG analyzes a no-action alternative and four action alternatives, each with various levels of motorized and mechanized use. (AR003852-910). The MRDG also documents detriments to wilderness character and other impacts of the Project.

        On November 8, 2023, Wilderness Watch filed its Complaint in this matter, alleging USFS' approval of the Project was arbitrary, capricious, or unlawful in violation of the Administrative Procedure Act and Wilderness Act. (Doc. 1 at 2-27) Both parties subsequently filed motions for summary judgement. (Doc. 15; Doc. 20).

## II.    <u>Legal Standard</u>

Courts review agency decisions under the Wilderness Act by applying the standard of review set forth in the Administrative Procedures Act ("APA"). *High Sierra Hikers Ass'n v. U.S. Forest Serv.,* 436 F. Supp. 2d 1117, 1129 (E.D. Cal. 2006); *Wilderness Society v. U.S. Fish and Wildlife Serv.,* 353 F.3d 1051, 1059 (9th Cir. 2003). The Rule 56 summary judgment standard is modified in cases requiring review of an administrative record pursuant to the APA; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017); 5 U.S.C. § 706(2)(A).

The APA standard of review is deferential. Courts must refrain from substituting their judgment for that of the agency and should limit their review of the agency's action to determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coalition v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (citing *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, an "agency's action must be upheld, if at all, on the basis articulated by the agency itself"; the court "may not accept . . . counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

Following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, *Chevron* deference no longer compels reviewing courts to defer to an agency's statutory interpretation. 603 U.S. 369, 412 (2024). However, agency interpretation may still provide guidance when considering statutory ambiguity. *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024). Specifically, an agency's interpretation of ambiguous statutory language may have the "power to persuade" based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Lopez*, 116 F.4th at 1036 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, (1944)).

## III.  <u>Discussion</u>

Congress passed the Wilderness Act in 1964 "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural

condition." *Wilderness Society,* 353 F.3d  at 1055 (quoting 16 U.S.C. § 1131(a)).

The Wilderness Act stands apart from other federal environmental legislation and

"is as close to an outcome-oriented piece of environmental legislation as exists

. . . . As such, it is as close to a 'purist manifesto' as may be found in the area of

environmental law." *High Sierra Hikers Ass'n,* 436 F. Supp. 2d at 1138.

The Wilderness Act defines wilderness as "an area where the earth and its

community of life are untrammeled by man, where man himself is a visitor who

does not remain." 16 U.S.C. § 1131(c). However, Congress did not mandate

preservation of wilderness "in a museum diorama, one that we might observe only

from a safe distance, behind a brass railing and a thick glass window." *Wilderness*

*Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1033 (9th Cir. 2010).

Rather, "wilderness was to be preserved as wilderness and made accessible to

people, 'devoted to the public purposes of recreational, scenic, scientific,

educational, conservation, and historical use.'" *Wilderness Watch,* 629 F.3d at

1033 (citing 16 U.S.C. § 1133(b)).

In light of these enumerated purposes, the Act includes a range of

prohibitions and exceptions that apply within designated wilderness:

> [E]xcept as necessary to meet minimum requirements for the administration
> of the area for the purpose of this chapter . . . there shall be no temporary
> road, no use of motor vehicles, motorized equipment or motorboats, no
> landing of aircraft, no other form of mechanical transport, and no structure
> or installation within any such area.

16 U.S.C.A. § 1133(c). To determine whether a nonconforming activity, such as the use of motor vehicles, may nevertheless be excepted under § 1133(c), courts in the Ninth Circuit apply a two-step framework for analysis set forth in *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.* *("Kofa")*, 629 F.3d 1024; *see also Californians for Alternatives to Toxics v. U.S. Fish and Wildlife Serv.*, 814 F. Supp. 2d 992 (E.D. Cal. 2011); *Wilderness Watch v. U.S. Fish & Wildlife Serv.*, 685 F. Supp. 3d 950 (D. Mont. 2023), *appeal dismissed*, No. 23-35577, 2023 WL 9860835 (9th Cir. Oct. 11, 2023). Under this framework, the reviewing court must first determine whether the agency action serves a valid statutory "purpose" under the Wilderness Act. These purposes include "recreational, scenic, scientific, educational, conservation, and historical use" as well as "protecting and preserving the wilderness in its natural condition." *Kofa*, 629 F.3d at 1033 (citing 16 U.S.C. § 1133(b),(c)).

Having determined that the prohibited activity serves the purposes of the Wilderness Act, the court must then determine whether the relevant agency has made "an adequately reasoned determination" that the prohibited activity is "necessary to meet the minimum requirements" for the administration of the wilderness area for that purpose. *Kofa,* 629 F.3d at 1036, 1040. This step requires a determination of necessity and a determination that the necessary activities were

limited "to the extent necessary." *See High Sierra Hikers Ass'n v. Blackwell,* 390

F.3d 630, 647 (9th Cir. 2004).

A.    The *Kofa* Framework Applies

Wilderness Watch generally contends that the Project's otherwise

nonconforming activities cannot be permissibly excepted under the Wilderness

Act. In support, Wilderness Watch relies on a reading of the Act that runs counter

to established precedent.

In *Kofa*, the Ninth Circuit held that a valid purpose under the Wilderness Act

may be found either in the preservation of wilderness character *or* in the list of uses

enumerated in 16 U.S.C. § 1133(b). In that case, plaintiffs—including Wilderness

Watch—argued that the U.S. Fish and Wildlife Service violated the Wilderness

Act's prohibition on the development of "structure[s] or installation[s]" within

designated wilderness. 629 F.3d at 1032 (quoting 16 U.S.C. § 1133(c)). To support

declining populations of bighorn sheep, the Fish and Wildlife Service had

constructed two water tanks that partially infringed on the Kofa National Wildlife

Refuge and Wilderness.

Analyzing whether the water tanks were excepted from the Wilderness Act's

prohibition on structures and installations, the court noted the tension written into

the statutory language of the Wilderness Act. "[W]e must analyze conflicting

instructions in the Wilderness Act: The Service must preserve the wilderness

character of the area while at the same time providing for 'recreational, scenic, scientific, educational, conservation, and historical use.'" *Kofa,* 629 F.3d at 1034 (quoting 16 U.S.C. § 1133(b)). The court went on to find that "conservation" is both a valid purpose of the Act and an ambiguous term, undefined in the statute.

In support of the decision to install the water tanks, the Fish and Wildlife Service argued that the conservation of bighorn sheep was consistent with the conservation purpose listed in § 1133(b). Applying *Skidmore*, the court found that the agency's reasoning was "thorough, valid, consistent, and persuasive." 629 F. 3d at 1035-36. Accordingly, the court deferred to the Service's interpretation that "conservation of the bighorn sheep is consistent with the purposes of the Wilderness Act." 629 F.3d at 1036. However, prohibited activities are only excepted under § 1133(c) to the extent necessary to fulfill a purpose of the Act. The court ultimately held that the agency failed to show that the water tanks were necessary to the conservation purpose. Therefore, the agency had violated the Wilderness Act. *Kofa*, 629 F.3d at 1039.

Although the court in *Kofa* ultimately found that the Fish and Wildlife Service violated the Wilderness Act, the court clearly held that "purpose," as used in § 1133(c), may include both the preservation of wilderness character as well as the uses enumerated in § 1133(b). 629 F.3d 1033-34. This precedent has since been applied by other courts within the circuit. *E.g., Wilderness Watch v. United States*

*Fish & Wildlife Serv.*, 685 F. Supp. 3d at 963; *Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192, 1205 (W.D. Wash. 2016), *aff'd*, 731 F. App'x 709 (9th Cir. 2018); *Wilderness Watch v. Iwamoto*, 853 F. Supp. 2d 1063, 1074 (W.D. Wash. 2012), *motion for relief from judgment granted*, No. C10-1797-JCC, 2012 WL 6766551 (W.D. Wash. Sept. 20, 2012); *Californians for Alternatives to Toxics*, 814 F. Supp. 2d at 1016.

Despite the regular application of the *Kofa* framework by courts within the Ninth Circuit, Wilderness Watch argues "wilderness character preservation is the sole aim against which necessity must be weighed." (Doc. 17 at 26). This assertion conflicts with the holding in *Kofa*, where the court found that (1) the Act's conservation purpose stands in tension with preservation of wilderness character and (2) conservation is an "explicit purpose" of the Act that can support an exception for activities that are necessary to meet the minimum requirements of that purpose. 629 F.3d at 1036. Further, Wilderness Watch implies that the court in *Kofa* misinterpreted the applicability of exceptions in § 1133(b). Specifically, Wilderness Watch argues the Ninth Circuit made a "linguistic slip" when it referred to "purposes" (plural), instead of a "*singular* purpose." (Doc. 24 at 19).

Recognizing the direct applicability of binding Ninth Circuit precedent, this Court will apply the *Kofa* framework to this case. In the years since the Ninth Circuit decided *Kofa*, multiple districts—including the District of Montana—have

14

applied this holding to cases with facts similar to those at hand. Wilderness Watch has neither distinguished this case from *Kofa* nor sufficiently explained why the Court should decline to follow precedent from that decision.

### B.    Multiple and Valid Purposes

The first step in the *Kofa* framework is to determine whether the nonconforming activities serve a valid purpose under the Act. To that end, USFS argues the Project serves two purposes—conservation of YCT and preservation of wilderness character. (Doc. 25 at 4-5). In contrast, Wilderness Watch argues preservation of wilderness character is the only valid purpose for excepting prohibited activities and that the Project does not serve that purpose. Further, Wilderness Watch maintains USFS' primary goal was not conservation. (Doc. 24 at 17).

As above, Ninth Circuit precedent establishes that valid purposes for the administration of wilderness include more that preserving wilderness character. Therefore, Wilderness Watch's argument that no other purpose can sustain an exception under § 1133(c) fails.

Wilderness Watch argues sportfishing, rather than conservation, was USFS' primary purpose for the project. (Doc. 24 at 17). USFS counters that while sportfishing was not the primary purpose, such a purpose would nevertheless support an exception under § 1133(c). (Doc. 22 at 21).

The United States District Court for the Eastern District of California considered similar issues in *Californians for Alternatives to Toxics.* 814 F. Supp 2d 992. There, the plaintiffs contended that an analogous trout-recovery project benefited recreational fishing and therefore would "elevate recreational activity over the long-term preservation of the wilderness character of the land" in violation of the Wilderness Act. 814 F. Supp. 2d at 1016. That assertion conflicted with the stated conservation purpose of the project, as described in the agency's Record of Decision. The court therefore held that, recreational benefits aside, the project "serve[d] a conservation purpose (not a recreational purpose), permissible under the Act." *Californians for Alternatives to Toxics.* 814 F. Supp. 2d at 1016. Likewise, the court in *Wilderness Watch, Inc. v. Bureau of Land Management* considered an analogous nonconforming activity and prohibition under the Wilderness act. That court held "offering one rationale does not necessarily preclude another . . . ." 799 F. Supp. 2d 1172, 1181 (D. Nev. 2011).

Moreover, in *Kofa*, the Ninth Circuit made no mention of the need for otherwise prohibited activities to support only a single purpose. Instead, that court merely held "the Wilderness Act prohibits 'structure[s] or installation[s]' unless they are necessary to meet the minimum requirements of a 'purpose' of the Wilderness Act." 629 F.3d at 1032 (citing 16 U.S.C. § 1133(c)). Under the *Kofa* framework, it is apparently irrelevant whether a given activity advances multiple

purposes. As long as a valid purpose is advanced, the first step in the analysis is satisfied.

For these reasons, to determine whether the nonconforming activities in the Project fall within the exception in § 1133(c), this Court need only consider whether the Project advances a valid purpose as enumerated in § 1133(b).

Here, the Project outlines two basic purposes: wilderness character and conservation of YCT. Different project goals correspond to these two purposes. According to the FEA, the conservation of YCT purpose is to be accomplished via (1) eradicating rainbow trout in order curtail hybridization and (2) establishing a secure population of YCT above the barrier cascade. The wilderness character purpose is to be accomplished by replacing non-native rainbow trout with YCT.

## C.    Conservation Purpose

The Wilderness Act provides conflicting instructions to agencies charged with administering its provisions. *Kofa*, 629 F.3d 1034. "The administering agency is charged with maintaining the wilderness character of the land, providing opportunities for wilderness recreation, managing fire and insect risk, and even facilitating mineral extraction activities." *High Sierra Hikers Ass'n*, 390 F.3d at 647 (citing 16 U.S.C. § 1133). This conflict led the court in *Kofa* to "conclude that the purpose of the Wilderness Act with regard to conservation is ambiguous." 629 F.3d 1033. Given this ambiguity, the court followed *Skidmore*, according "respect"

17

to the agency's interpretation of the statutory language. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, (1944); 629 F.3d 1033; *see also High Sierra Hikers Ass'n,* 390 F.3d at 648.

Under *Skidmore*, an agency interpretation may inform the court "to the extent it rests on factual premises within [the agency's] expertise." *Loper Bright Enterprises,* 603 U.S at 374 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n. 8, (1983)). Agency interpretations "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Loper Bright Enterprises,* 603 U.S. at 394 (quoting *Skidmore*, 323 U.S. at 140). Whether an agency's interpretation has the "power to persuade" will "depend upon the thoroughness evident in its consideration, the validity of its reasoning" and "its consistency with earlier and later pronouncements." *Skidmore,* 323 U.S. at 140.

When considering an agency's determination that nonconforming activities serve a valid purpose under the Wilderness Act, courts applying the *Kofa* framework have emphasized the persuasive value of administering agencies' (1) consistent decision-making and management efforts (2) thorough consideration of the challenged action and requirements of the Wilderness Act.

Administering agencies have demonstrated consistency by reference to a history of agency management efforts. For instance, in *Wilderness Watch v. U.S.*

*Fish & Wildlife Serv.,* the court noted "recent history shows efforts to conserve the Centennial Valley grayling population." 685 F. Supp. 3d at 962; *see also Wilderness Watch v. Bureau of Land Mgt.*, 799 F. Supp. 2d at 1178 ("helicopter search and rescue training has been carried out for over four decades in these wilderness areas"). Courts have also noted consistency between nonconforming activities and the purposes for establishing or reserving the public lands, prior to wilderness designation. *See Kofa,* 629 F.3d at 1035; *Wilderness Watch v. U.S. Fish & Wildlife Serv.*, 685 F. Supp. 3d at 961.

Administering agencies have demonstrated thoroughness by considering the requirements of the Wilderness Act as they relate to general management plans as well as specific projects. In *Wilderness Watch v. Bureau of Land Mgt.*, the Court held the agency's "decision-making process . . . demonstrates thoroughness in the drafting and comment process conducted for each document as evidenced throughout the record." 799 F. Supp. 2d at 1178. Likewise, in *Kofa*, the court emphasized thoroughness in a general management plan, which adequately considered the requirements that wilderness designation would impose on conserving bighorn sheep. 629 F.3d at 1035.

Here, USFS argues YCT conservation would further the purposes of the Wilderness Act. In support, USFS offers several goals that might be advanced by the Project—addressing the threat of hybridization, removing a "functionally

19

invasive" species from the landscape, and establishing a secure population of YCT above the barrier cascade. Although USFS' briefing as well as relevant documents in the administrative record state that the Project lays the groundwork to establish YCT above the barrier cascade on Buffalo Creek, the agency has established that this is a secondary purpose for the project.[1]

Wilderness Watch contends "[t]he [P]roject's aims were also explicitly to benefit recreational use and desired biological conditions *outside* the Wilderness in Yellowstone National Park." (Doc. 17 at 24). Therefore, Wilderness Watch argues, the Project would violate the Wilderness Act by allowing nonconforming activities within wilderness in service of purposes that manifest outside the wilderness.

Wilderness Watch is correct that a primary purpose of the Project—protecting the genetic integrity of YCT by eliminating rainbow trout—would yield benefits outside the Absaroka-Beartooth Wilderness. The Project is intended to eliminate rainbow trout in Buffalo Creek. Buffalo Creek flows generally south, from the Absaroka-Beartooth Wilderness into Yellowstone National Park. (AR002819). The barrier cascade is located south of where the creek leaves the National Forest and enters Yellowstone National Park. (AR002606). Currently,

---

[1] "The primary goal of this project is to remove rainbow trout from the Buffalo Creek watershed, which would protect the genetic integrity of [YCT] in the Lamar River basin while improving the natural quality of wilderness character that is degraded by the presence of a nonnative and functionally invasive fish species." (AR002597).

there is no apparent population of YCT upstream of the barrier cascade. (AR002606). Eradicating rainbow trout therefore would not benefit any extant population of YCT in Buffalo Creek within the wilderness. Rather, the Project would eliminate a population of rainbow trout that are the primary source of hybridization within the broader Lamar River watershed.

However, the fact that the Project would benefit conservation efforts beyond the wilderness boundary does not substantiate Wilderness Watch's argument that the Project fails to serve a valid purpose under the Wilderness Act. Wilderness Watch fails to cite caselaw to show that any conservation purpose yielding benefits outside wilderness is foreclosed by the Wilderness Act. Rather, it should be expected that the benefits of a project serving a wildlife conservation purpose might cross administrative boundaries as individual animals migrate in or out of designated wilderness.

Overall, the administrative record shows a consistent history of USFS efforts to conserve YCT in the Project area. This consistency weighs in favor of USFS' interpretation of its responsibilities and limitations under the Wilderness Act. In 2000, the USFS signed the Cooperative Conservation Agreement for Yellowstone Cutthroat Trout within Montana. (AR020463). That agreement was "directed toward conservation of [YCT] as a unique subspecies in their historic range within Montana." (AR020466). The agreement also focuses attention on genetic integrity

as a critical component of YCT conservation.[2] (AR020466; AR020471). The

agreement is specific to landscapes encompassing the Absaroka-Beartooth

Wilderness. "For the purposes of this conservation effort, [YCT] historical habitat

will include the mainstem Yellowstone River and tributaries above the confluence

of the Bighorn River." (AR020467).

   The administrative record shows similarly consistent focus on conservation

of YCT in documents such as the 2010 Multi-State Conservation Agreement

(AR014826), the 2007 Memorandum of Understanding and Conservation

Agreement (AR014870), and the 2013 Yellowstone Cutthroat Trout Conservation

Strategy for Montana (AR014771). All these documents show a history of

conservation efforts that is consistent with the project goals, as described in the

FEA. The Project also shows consistency with the purposes for which the

Absaroka-Beartooth Wilderness was established. For instance, the 1974 USFS

proposal to establish the Beartooth Wilderness lists native populations of cutthroat

trout among landscape's unique resources. (AR016342).

   USFS' approach to the Project also demonstrates thoroughness, further

weighing in favor of the Agency's interpretation of its responsibilities under the

Wilderness Act. Like the agency in *Wilderness Watch v. Bureau of Land Mgt.*,

---

[2] "The Agreement also addresses the management needs associated with
preservation of the unaltered genome and conservation of populations that express
the [YCT] phenotype . . . ." (AR020466).

USFS showed thoroughness in drafting and preparing project documents. At multiple junctures, the public had the opportunity to submit comments on the Project. The genesis, support, and intent of the Project are thoroughly detailed in documents such as the FEA and MRDG. Further, like the agencies in *Kofa* and *Wilderness Watch, Inc. v. Creachbaum*, USFS decisions regarding the Project were guided by management plans and policies that reflect the requirements imposed by wilderness designation. For instance, portions of the Custer Gallatin National Forest Land Management Plan (AR000112-18) as well as Forest Service Manual 2323.32 (AR015946) direct the agency to adhere to the strictures of the Wilderness Act in its decision-making.

Given USFS' consistent efforts to conserve YCT in the Absaroka-Beartooth Wilderness and the agency's thorough consideration of the Project and the requirements of the Wilderness Act, this Court finds USFS' reasoning was "thorough, valid, consistent, and persuasive." *Kofa,* 629 F.3d at 1036. Therefore, the Court adopts USFS' interpretation that conservation of YCT, as manifest in the Project, is consistent with statutory purposes for the administration of wilderness under 16 U.S.C. 1133(b).

### D.    Necessary Extent

Without the exception under § 1133(c), many Project activities would violate the Wilderness Act. Among other prohibitions, 16 U.S.C. § 1133(c) makes clear

23

that in designated wilderness areas there shall be no "use of motor vehicle vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation . . . ." The only exception to these prohibitions is where such actions are "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter." 16 U.S.C. § 1133(c). As above, the Ninth Circuit has made clear that "purpose of this chapter" includes "conservation," as listed in 16 U.S.C. § 1133(b).[3] *Kofa,* 629 F.3d at 1036. The Ninth Circuit has further held that in order to satisfy the exception contained in § 1133(c), the agency proposing otherwise prohibited activity must make an "adequately reasoned determination of necessity." *Kofa*, 629 F.3d at 1036 (citing *High Sierra Hikers Ass'n,* 390 F.3d at 646-67). A "*generic* finding of necessity does not suffice." *Kofa,* 629 F.3d at 1037.

In *Kofa,* the court held that agency's determination of necessity was not sufficient to satisfy the statutory requirements of § 1133(c). There, the U.S. Fish and Wildlife Service constructed water tanks partially within designated wilderness, in violation of the Wilderness Act's prohibition against any "structure of installation within any such area." 16 U.S.C. § 1133(c). The water tanks were installed for the purpose of stemming the decline of bighorn sheep in the area.

---

[3] "[W]ilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, education, conservation, and historical use." 16 U.S.C. § 1133(b).

Although the water tanks addressed one variable affecting conservation of the species, the court held that the agency did not adequately consider that variable in relation to other factors affecting the number of bighorn sheep in the area. Further, the agency failed to "weigh the relevant factors 'in relation to one another' . . . ." *Kofa*, 629 F.3d at 1039 (quoting *High Sierra Hikers Ass'n,* 390 F.3d at 647).

### 1.    Genetic Integrity

As a threshold matter, USFS must demonstrate that addressing hybridization with rainbow trout is necessary for YCT conservation. Hybridization and genetic integrity add a layer of complexity to the facts of this case. In *Kofa* the agency's conservation efforts were generally concerned with overall population numbers of bighorn sheep. Similarly, in *Wilderness Watch v. U.S. Fish and Wildlife Serv.,* conservation efforts revolved around a target number of arctic grayling in a particular lake. 685 F. Supp. 3d 950.

Here, hybridization presents a twofold threat to YCT. First, hybrid fish are less "fit," and so in theory are less likely to survive. (AR002605). Second, hybridization reduces the overall number of "genetically pure" fish, resulting in a population that did not coevolve with the ecosystem. The administrative record establishes that "[h]ybridization is the greatest cause for the decline of Yellowstone cutthroat trout." (AR014731). Further, rainbow trout in Buffalo Creek drainage are "the primary source of hybridization in the Lamar River watershed" and "[t]his

hybridization threatens the entire Lamar River population of cutthroat trout . . . ."
(AR002603; AR002596).

Wilderness Watch alleges that the Project cannot be necessary because, as in
*Kofa*, other approaches might sufficiently address the threats to YCT without
requiring nonconforming activities. (Doc. 24 at 5). Specifically, Wilderness Watch
alleges "[t]he Yellowstone cutthroat trout 'Conservation Strategy for Montana'
documents a breadth of threats around the landscape, including stream dewatering,
passage barriers, habitat fragmentation, agriculture, climate change, residential
development, and diseases." (Doc. 25 at 25; AR20264-65). Yet, Wilderness Watch
fails to name any alternative measures that would address genetic integrity. Instead,
Wilderness Watch only highlights threats and solutions in the administrative record
other than those involving genetic integrity.

In *Kofa*, the different variables that the agency failed to consider in relation
to one another all contributed simply and directly to fewer bighorn sheep. "It is
beyond dispute that, if addressing other variables will lead to satisfactory sheep
recovery, then a new structure is not 'necessary.' The Service's complete failure to
address that key question is fatal to its conclusion." *Kofa* at 1039.

Here, the threat of hybridization cannot be nullified by addressing other
variables. It is conceivable that even if USFS pursued every other avenue for YCT
conservation, genetic hybridization would still threaten the entire population of

26

YCT in the Lamar River watershed. Therefore, addressing genetic integrity is necessary for the conservation of YCT in the Lamar River watershed.

Inasmuch as it is necessary to address the threat of hybridization, it is further necessary to do so in Buffalo Creek. "This project is tied directly to protection of the Lamar River YCT, definitely threatened by rainbow trout in Buffalo Creek, and thus this action must occur at the location proposed to be effective." (AR004007). Given the nature of trout migration and the Lamar River watershed, it is predicted that rainbow trout hybridization will "continue to expand into all upstream connected waters until there are no genetically pure Yellowstone cutthroat trout remaining." (AR003992). Eliminating rainbow trout in Buffalo creek is therefore necessary to remove the primary source of hybridization in this portion of the watershed.

Wilderness Watch challenges the necessity of addressing hybrid trout at their source in Buffalo Creek. Wilderness Watch argues that because hybridization has occurred *outside* the Project area, addressing the presence rainbow *inside* the Project area is not necessary. (Doc. 24 at 24). In essence, Wilderness Watch argues that the Project will not be sufficient to fully address hybridization. However, to support an exception under 16 U.S.C. § 1133(c), agency actions must only be necessary for a valid purpose. There is no apparent requirement that project activities must be sufficient. It may be the case that hybrid trout remain in the

Lamar River Watershed after the Project is complete, but the Project is nevertheless intended to eliminate the primary source of hybridization. Therefore, while additional efforts may be required to eliminate lingering populations of hybrid fish, the administrative record supports the conclusion that protecting the genetic integrity of YCT requires the instant actions in Buffalo Creek. (AR003994).

Wilderness Watch further questions the necessity of the Project, arguing that USFS impermissibly planned the Project in Buffalo Creek because that location offers more "bang for the buck" than other streams located outside the wilderness boundary. (Doc. 17 at 27). In support, Wilderness Watch points to language in the Supplement to the MRDG, where USFS the Project is compared to another "feasible opportunity to establish a secure genetically pure YCT metapopulation above a natural falls in the Yellowstone Headwaters Subbasin . . . ." (AR003994). However, that "opportunity" addresses the possibility of establishing a genetically pure YCT population and not a means to eliminate the threat of hybridization. As USFS convincingly argues, the only means of securing YCT in the Lamar River watershed is to remove rainbow trout from Buffalo Creek. (Doc. 22 at 29).

### 2. Project Activities

The contents of the administrative record reinforce USFS' determination that the Project's nonconforming activities are necessary for conservation of YCT. Project nonconforming activities include the application of rotenone to eradicate

rainbow trout, the use of mechanical equipment and motorized transportation, and the installation of temporary structures. The documented rational behind each of these decisions demonstrates that the Project does not exceed its necessary extent in relation to the goal of eliminating rainbow trout from Buffalo Creek and the purpose of YCT conservation.

As a threshold matter, USFS's briefing and the administrative record address the necessity of piscicide application as the chosen means for eliminating rainbow trout. USFS' argument here is simple—applying rotenone is the only feasible way to eradicate rainbow trout in Buffalo Creek. In the MRDG, USFS considers a "Mechanical Removal Alternative" to rotenone application. (AR003905). This alternative would involve electrofishing and gillnetting. However, the Mechanical Removal Alternative was rejected because "[t]he project objective of complete rainbow trout eradication could not be met with these methods because they have limited effectiveness in deep and complex habitats found within the project area." (AR003905). Similarly, the "amount of algae in Hidden Lake would quickly clog gill nets making them ineffective at catching fish." (AR003905). Given the determination that no other method would achieve the purpose, USFS has sufficiently established that rotenone is necessary for the purpose of YCT conservation.

Because piscicide is necessary to eliminate rainbow trout, additional nonconforming activities are required to carry out the Project. The required nonconforming activities include the use of inflatable motorized boats, mechanical pumps, helicopter landings, and aerial spraying of open water. As the Final Decision Notice indicates, "there are no non-motorized means that could achieve the project objective of a complete fish kill in the Buffalo Creek." (AR002830).

Because the application of rotenone to Buffalo Creek requires motorized means and nonconforming measures, the MRDG considers three project action alternatives. Each alternative involves different levels of aircraft use to support Project activities. The MRDG rejected the Aircraft Supported Alternative because it relied on more helicopter landings than necessary. (AR003908). An unnecessary number of helicopter landings would have an unnecessary impact on wilderness character. The MRDG similarly rejected the Stock Supported alternative because it would "greatly reduce the likelihood of eliminating rainbow trout from the watershed." (AR003908).

Finally, USFS considered the Aircraft and Stock Supported Alternative. This alternative included two variants—with and without aerial restocking of YCT. Because restocking is irrelevant to the goal of removing rainbow trout from Buffalo Creek the distinction is immaterial here. Nevertheless, the MRDG identifies the Aircraft and Stock Supported Alternative Without Aerial Restocking

as the best option for implementing the project. This alternative "maximizes traditional means of transportation when possible and minimizes the number of prohibited uses for the purpose of administering the Absaroka Beartooth Wilderness in compliance with the Wilderness Act." (AR003909).

Wilderness Watch contends USFS was arbitrary and capricious for refusing to consider alternatives that would prohibit the restocking of YCT after eradicating rainbow trout. Wilderness Watch attributes this alleged failure to consider alternatives to an "erroneously circumscribed view of [USFS's] authority under the law." (Doc. 24 at 22). This Court does not find it necessary to determine USFS' authority regarding state efforts to restock YCT using primitive means. While the Project clearly envisions restocking, efforts to that end are distinct from Project activities intended to eradicate rainbow trout from Buffalo Creek for the purpose of preventing hybridization. Eradication is not affected by restocking and may proceed whether or not YCT are reintroduced. Although restocking affects other Project goals—establishing YCT above the barrier cascade and enhancing wilderness character by replacing rainbow trout with YCT—preventing hybridization is a sufficient and independent justification for otherwise nonconforming Project activities.

As above, the FEA describe three interrelated goals for the Project. The measures described in the Project contribute to all of these goals. Indeed, all three

goals depend on the same suite of activities to eradicate rainbow trout. Because the same nonconforming activities would further each goal, it follows that any goal—and its attendant "purpose" under the Wilderness Act—can be a sufficient basis to support a finding that § 1133(c)'s requirements have been met. Therefore, because the requirements of § 1133(c) have been met as to the goal of preventing hybridization (and the purpose of YCT conservation) it is not necessary to consider whether the remaining project goals would also sustain the exception.

The consideration behind each of the decisions involved in the Project shows a "rigorous balancing of all relevant interests." *Californians for Alternatives to Toxics,* 814 F. Supp. 2d at 1022. Plaintiffs have not demonstrated that any project component exceeds the minimum requirements necessary for the purpose of YCT conservation. Instead, USFS has demonstrated that the project is necessary and therefore meets the requirements of the exception in 16 U.S.C. § 1133(c).

## IV.    <u>Conclusion</u>

Absent a showing that Project activities are "necessary to meet minimum requirements" for the administration of the Absaroka-Beartooth Wilderness for a wilderness purpose, many of the activities that constitute the Project would be generally prohibited under 16 U.S.C. 1133(c). However, USFS has demonstrated (1) the Project serves the valid purpose of conservation of YCT, and (2) the otherwise prohibited activities are necessary for the minimum administration of

32

that purpose. Therefore, the Project's otherwise nonconforming activities are allowable under the exception in § 1133(c). Accordingly,

IT IS RECOMMENDED that Wilderness Watch's motion for summary judgement be DENIED and USFS' cross-motion for summary judgment be GRANTED.

IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 21st day of March, 2025.

Kathleen L. DeSoto
United States Magistrate Judge