Daniel Brister
Wilderness Watch
P.O. Box 9175
Missoula, Montana 59807
Tel: 406-542-2048
danb@wildernesswatch.org

Dana Johnson
Wilderness Watch
P.O. Box 9765
Moscow, Idaho 83843
Tel: 208-310-7003
danajohnson@wildenresswatch.org

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| WILDERNESS WATCH,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES FOREST<br>SERVICE, an agency of the U.S.<br>Department of Agriculture,<br><br>    Defendant. | Case No. 9:23-cv-00133-DLC-KLD<br><br><br>**PLAINTIFF'S OBJECTIONS TO<br>MAGISTRATE'S FINDINGS<br>AND RECOMMENDATION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION ........................................................................................... 1

LEGAL STANDARDS .................................................................................... 3

PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S FINDINGS
AND RECOMMENDATIONS ........................................................................... 5

    I. Misapplication of the *Kofa* Two-Step Test for the Section
    1133(c) Exception ................................................................................ 5

        A. The first step of *Kofa's* two-step test does not create an
        "either / or" standard and other Ninth Circuit precedent
        expressly rejects such a standard……………………………………………5

        B. *Kofa's* step-one analysis was informed by the fact that the Kofa Wildlife
        Refuge was designated specifically for bighorn sheep conservation. A
        comparable designation purpose does not exist here, and the wilderness
        watersheds at issue were historically fishless.
        ................................................................................ 11

        C. Unlike *Kofa*, the primary (and speculative) benefit occurs
        outside of the Wilderness .......................................................... 13

        D. Section 1133(c), and *Kofa's* two-step test applying it, does
        not apply to rotenone poisoning and fish stocking................................. 14

    II. Erroneous Segmentation of Fish Stocking Component........................... 16

    III. Improper Deference to Forest Service's Authorization of the
    Alternative Most Harmful to Wilderness Character.................................... 22

    IV. Deference to the Forest Service's Interpretation of the
    Wilderness Act Is No Longer Appropriate.................................................. 25

CONCLUSION .............................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Spear*, 520 U.S. 154 (1997)…………...…………………………… 17 n.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)……..........24

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004)…9, 10, 18, 24

*High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117
(E.D. Cal. 2006)…………………………………………………………………..21

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)……………………..25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*,
463 U.S. 29 (1983)………………………………………………………..…..3, 21, 24

*Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059 (9th Cir.)………………17 n.

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998)…………………… 17 n.

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977
(9th Cir. 2006)……………………………………………………………………17 n.

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051
(9th Cir. 2003) (en banc)…………………………………………………...4, 8, 9, 15, 18

*Wilderness Watch v. Creachbaum,* 225 F. Supp. 3d 1192
(W.D. Wash 2016)…………………………………………………………………6 n.

*Wilderness Watch v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024
(9th Cir. 2010)……………………........2, 5, 6, 7, 11, 12, 13, 14, 16, 18, 20, 22, 26

*Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170 (D. Idaho 2017)………..10, 20

*Wyoming v. U.S.*, 279 F.3d 1214 (10th Cir. 2002)………………………………..21

**Statutes**

5 U.S.C. § 706(2)……………………………………………………….3, 21

16 U.S.C. § 1131(a)…………………………………………………….4, 8, 9, 15

16 U.S.C. § 1131(c)…………………………………………………...4, 8

16 U.S.C. § 1133(b)…………………………4, 5, 6, 7, 9, 13, 14, 15, 16, 18, 20, 21

16 U.S.C. § 1133(c)…………………………………..5, 6, 14,15, 16, 17, 18

28 U.S.C. § 636(b)(1)…………………………………………………...1, 3

**Rules and Regulations**

Fed. R. Civ. P. 72(b)…………………………………………………...1, 3

D. Mont. Local Rule 72.3……………………………………………...1, 3

## INTRODUCTION

Plaintiff Wilderness Watch respectfully submits the following objections to Magistrate Judge DeSoto's Findings and Recommendation ("Recommendation") (Doc. 31), which recommends granting summary judgment in favor of the United States Forest Service and denying Plaintiff's motion for summary judgment. These objections are filed pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(2), and Local Rule 72.3.

The "Buffalo Creek Yellowstone Cutthroat Trout Conservation Project" ("Project") unlawfully elevates managers' desired outcomes above the Wilderness Act's "untrammeled" mandate. The Recommendation upheld a stunning amount of intensive motorized and mechanical intrusions and other prohibited activities in the Wilderness—an amount rarely seen in the National Wilderness Preservation System—to poison miles of streams and wetlands in a remote watershed. The Project is nearly identical to other projects being proposed by Montana Fish, Wildlife and Parks ("FWP") in other wilderness areas across Montana presenting a significant precedential threat to wilderness protection.[1] The Project's aim is to kill

---

[1] *See, e.g., Wilderness Watch v. Marten*, No. 9:21-cv-00082-DLC (resolved after the Forest Service withdrew a nearly identical project in the Scapegoat Wilderness); *Friends of the Wild Swan v. Hammond*, No. 9:24-cv-00128-KLD (agencies withdrew a similar project in recommended wilderness in Glacier National Park).

all the fish present (rainbow trout, which are the legacy of a 1930s stocking effort) and then to replace them with a new species of human-stocked fish (Yellowstone cutthroat trout), which are not native to the naturally fishless waters in the project area, but whose genetic purity in waters elsewhere is a subject of management concern.

This case raises significant implications for the statutory protections of Wilderness areas throughout the country, and Judge DeSoto's Recommendation rests on legal and factual errors that warrant de novo review. Chief among them is the overextension of *Wilderness Watch v. U.S. Fish & Wildlife Serv.* ("*Kofa*") in a manner that sets a new legal standard for wilderness degrading activities, runs counter to Ninth Circuit precedent, and undermines the integrity of the Wilderness Act and the National Wilderness Preservation System.

The Recommendation also unlawfully segments the Buffalo Creek Project into separate fish eradication and restocking components, declining to address the legality of the latter. But this component action lies at the heart of Plaintiff's legal challenge and is part of what represents a broad precedential threat to Wilderness administration nationwide. The Recommendation separately fails to enforce the strict statutory requirement that any nonconforming use in wilderness be the "minimum necessary" to administer the area for the purpose of the Wilderness Act. These and other errors require rejection of the Recommendation and issuance of an

order granting Plaintiff's motion for summary judgment or, alternatively, remand for reconsideration under the correct legal standards.

## LEGAL STANDARDS

Pursuant to 28 U.S.C. § 636(b)(1), a district court must conduct de novo review of those portions of a magistrate judge's findings and recommendations to which a party properly objects. *See also* Fed. R. Civ. P. 72(b)(3). A district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id*.

Local Rule 72.3(a) requires that objections identify the specific factual findings and legal conclusions objected to, with supporting evidence and authority.

The Administrative Procedure Act (APA) provides the standard for reviewing final agency actions. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While courts afford some deference to agency expertise, that deference does not extend to interpretations that contravene statutory mandates, ignore relevant factors, or fail to engage in reasoned decision-making. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins*., 463 U.S. 29, 43 (1983).

The Wilderness Act guides federal land management in designated wilderness. Its "explicit statutory purpose [is] 'to assure that an increasing

population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition.'" *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1055 (9th Cir. 2003) (en banc) (quoting 16 U.S.C. § 1131(a)).

The Act defines "wilderness" as "an area where the earth and its community of life are untrammeled by man," as "retaining its primeval character and influence," and as "protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c). Although the Wilderness Act recognizes conservation and other public benefits to which wilderness preservation is devoted, *see* 16 U.S.C. § 1133(b), the statute places paramount its specific protective mandate, requiring that all activities in designated Wilderness be conducted in a manner that "preserv[es] . . . wilderness character" and "will leave [designated areas] unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a) (emphasis added). Administration must ensure that Wilderness is "affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." 16 U.S.C. § 1131(c).

Congress expressly prohibited certain activities antithetical to wilderness character preservation. The statute dictates that "there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of

aircraft, no other form of mechanical transport, and no structure or installation" within Wilderness areas. 16 U.S.C. § 1133(c). The only exception this provision affords is for activities that are "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id.*

The Wilderness Act imposes a legal duty on federal lands agencies to "preserv[e] the wilderness character of the area" and "administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

Agency actions inconsistent with the preservation of wilderness character—especially those involving human control and manipulation—require the most exacting justification under the law. This principle governs the Court's review of the Buffalo Creek Project.

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S FINDINGS AND RECOMMENDATION

### I. Misapplication of the *Kofa* Two-Step Test for the Section 1133(c) exception.

The Recommendation rests on misapplications and overextensions of the Ninth Circuit's decision in *Wilderness Watch v. U.S. Fish & Wildlife Serv.* ("*Kofa*"), 629 F.3d 1024 (9th Cir. 2010).

    A. <u>The first step *of Kofa's* two-step test does not create an "either / or" standard and other Ninth Circuit precedent expressly rejects such a standard.</u>

The Recommendation overextends the *Kofa* test for authorizing otherwise prohibited activities under Section 1133(c) of the Wilderness Act and fails to reconcile other Ninth Circuit precedent contrary to the Recommendation. Section 1133(c) prohibits various uses "except as necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." 16 U.S.C. 1133(c). *Kofa* employs a two-step test for this exception whereby a prohibited activity must 1) serve a valid purpose of the Wilderness Act and 2) be "necessary" to meet the "minimum requirements for the administration of the area." *Kofa*, 629 F.3d 1024,1032-33, 1037 (9th Cir. 2010). Regarding step one, the Recommendation states, "In *Kofa*, the Ninth Circuit held that a valid purpose under the Wilderness Act may be found either in the preservation of wilderness character *or* in the list of uses enumerated in 16 U.S.C. § 1133(b)." Recommendation at 12 (emphasis in original). The Recommendation further states that "[d]espite the regular application of the *Kofa* framework by courts within the Ninth Circuit, Wilderness Watch argues 'wilderness character preservation is the sole aim against which necessity must be weighed.'" Recommendation at 14.

To be clear, Plaintiff believes the Ninth Circuit panel's statutory analysis in *Kofa* is strained,[2] but Plaintiff is not asking this Court to render a decision that runs

---

[2] Plaintiff petitioned for en banc review in *Wilderness Watch v. Creachbaum,* 225 F. Supp. 3d 1192, 1205 (W.D. Wash 2016), *aff'd,* 731 F. App'x 709 (9th Cir.

counter to *Kofa* or other Ninth Circuit precedent. *Kofa* does not set forth an "either / or" standard where an agency may choose between preserving wilderness character or pursuing public uses of wilderness, nor did the Ninth Circuit adopt a reading that elevates public uses over wilderness preservation. Instead, the Ninth Circuit recognized that the Wilderness Act requires agencies both to preserve wilderness character and to administer Wilderness for certain public purposes. As the court put it, "The Service must preserve the wilderness character of the area while at the same time providing for 'recreational, scenic, scientific, educational, conservation, and historical use.'" *Kofa*, 629 F.3d at 1034. It then found the term "conservation" ambiguous in relation to the purpose of the Wilderness Act and ultimately decided the agency authorization was unlawful under step two of the analysis.

The Recommendation's "either / or" standard is also an impermissible extension of *Kofa* because it would undermine the agency's statutory duty to preserve wilderness character and to "administer [wilderness] for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b). The Act's overarching mandate is stated in 16 U.S.C. § 1131(a), which directs that Wilderness be administered "for the use and

2018).  There, a Ninth Circuit panel issued a short, unpublished opinion upholding a district court's analysis of the reconstruction of historic buildings in wilderness under the *Kofa* framework. The Ninth Circuit declined en banc review in that case.

enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness" and "to provide for the protection of these areas, the preservation of their wilderness character." The provision is conjunctive, not disjunctive: agencies must preserve wilderness character and pursue other purposes to the extent they are compatible with that mandate. While there is likely to be some tension between public use of wilderness and the Act's preservation mandate, this provision underscores that preservation of wilderness character is the overarching value of the statute.

Section 1131(c) further defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." The term "untrammeled" is essential: it reflects the congressional intent to limit human manipulation of ecological processes within designated wilderness. The Act thus protects not just the absence of development and mechanization, but the freedom of natural systems from purposeful human control, interference, and meddling. As a Ninth Circuit en banc panel explained, the Act's opening section "sets forth the Act's broad mandate to protect the forests, waters, and creatures of the wilderness in their natural, untrammeled state" and "show[s] a mandate of preservation for wilderness and the essential need to keep [nonconforming uses] out of it." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1061-62 (9th Cir. 2003) (en banc).

Section 1133(b), describing public use of wilderness, reinforces this by stating an agency "shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." The consistent reference to wilderness character in all three provisions establishes that preservation is the statute's overarching and unifying purpose even where the statute also lists various public purposes for the use of wilderness.

This reading is in line with Ninth Circuit precedent that expressly rejected an "either / or" tradeoff between the preservation of wilderness character and public use:

> The Wilderness Act twice states its overarching purpose. In Section 1131(a) the Act states, "and [wilderness areas] shall be administered for the use and enjoyment of the American people *in such a manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character*." 16 U.S.C. § 1131(a) (emphasis added). Although the Act stresses the importance of wilderness areas as places for the public to enjoy, it simultaneously restricts their use in any way that would impair their future use *as wilderness*. This responsibility is reiterated in Section 1133(b), in which the administering agency is charged with preserving the wilderness character of the wilderness area.

*High Sierra Hikers' Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004)

("*Blackwell*") (emphases in original).

Even where the statute provides for exceptions or various other purposes, and where there may be some inherent tension in those directives, the test for legality is still "the impact [the agency's] decision would have on its ultimate responsibilities under the Wilderness Act"—to preserve wilderness character. *Id*. This principle has been reaffirmed in other federal cases. As the court explained in *Wilderness Watch v. Vilsack*, the "overarching purpose" of Congress in passing the Wilderness Act was to preserve the 'wilderness character' of that land. Congress made preservation of wilderness values 'the primary duty of the Forest Service, and it must guide all decisions as the first and foremost standard of review for any proposed action.'" 229 F. Supp. 3d 1170, 1181-82 (D. Idaho 2017) (internal citations omitted).

Indeed, in *Blackwell*, the Ninth Circuit noted the agency improperly "elevated recreational activity [another public use listed alongside conservation] over the long-term preservation of the wilderness character of the land," particularly "[g]iven the Wilderness Act's repeated emphasis of the administering agency's responsibility to preserve and protect wilderness areas." *Blackwell*, 390 F.3d at 647, 648. Similarly, agencies may not elevate conservation goals— especially those benefiting areas outside wilderness boundaries—above the Act's central preservation mandate. The Recommendation not only creates a faulty

"either / or" standard, it also fails to reconcile the standard with *Blackwell's* conflicting precedent.

This reading is also aligned with the Forest Service's wilderness management policies. Forest Service Manual ("FSM") 2320.3(1) requires that "wilderness values shall dominate over all other considerations except where limited by the Wilderness Act, subsequent legislation, or regulations." AR015924. FSM 2320.2(2) likewise mandates that wilderness be maintained in a condition "unaffected by human manipulation and influences so that plants and animals develop and respond to natural forces." AR015923. And FSM 2320.6 emphasizes that "preserving the wilderness resource is the overriding value," and that "economy, convenience, commercial value, and comfort are not standards of management or use of wilderness." AR015927. The Forest Service's failure to reconcile its project—to poison the Buffalo Creek drainage and kill not only rainbow trout, but also many of the native aquatic biota that live there, and then stock these naturally fishless waters with another species not native to this ecosystem—with these directives is arbitrary and capricious.

    B. <u>*Kofa's* step-one analysis was informed by the fact that the Kofa Wildlife Refuge was designated specifically for bighorn sheep conservation. A comparable designation purpose does not exist here, and the wilderness watersheds at issue were historically fishless.</u>

In *Kofa*, the Ninth Circuit noted that management for bighorn sheep was central to the purpose of the area's original and historical designations. The Kofa Game Range was created in 1939 by presidential proclamation specifically to protect desert bighorn sheep. *Kofa*, 629 F.3d 1024, 1026-27 (9th Cir. 2010). Later, the reserve became the Kofa National Wildlife Refuge. *Id*. The court engaged in extensive discussion of this historical context, ultimately finding it relevant to determining whether bighorn conservation could qualify as a statutory purpose under the Wilderness Act. *Id*. at 1035–36.

Here, no such designation history exists. The Recommendation states that the 1974 "proposal to establish the Beartooth Wilderness lists native populations of cutthroat trout among the landscape's unique resources," Recommendation at 22 (citing AR016342), but a passing mention of cutthroat among a list of twenty species existing in the Absarokas is far different than the deliberate bighorn sheep conservation basis underpinning the Kofa Game Range designation. *See Kofa*, 629 F.3d at 1035. Neither the Absaroka-Beartooth Wilderness nor the National Forest history that preceded it was designated for the explicit purpose of protecting Yellowstone cutthroat trout, let alone preserving the genetic purity of the species.

Further, fish in confined aquatic ecosystems are different than bighorn sheep who move freely across a terrestrial landscape. Here, the aquatic system at issue inside the Wilderness was naturally fishless due to a downstream migration barrier,

and the ecosystem evolved as such until fish stocking began nearly a century ago. AR002606, 002657. Accordingly, the factual situation here is not analogous to the one in *Kofa*.

C. Unlike *Kofa*, the primary (and speculative) benefit here occurs outside of the Wilderness.

The overextension of *Kofa* leads to another absurd result in this case. The Recommendation repeatedly cites the Project's benefit to Yellowstone cutthroat trout in the Lamar River basin, downstream of the wilderness boundary, as justification for its implementation. *See* Recommendation at 4 (citing AR002603), 5, 20–21. The Forest Service selected the most wilderness-degrading alternative in its Minimum Requirements Decision Guide—an alternative tied for the lowest wilderness character score, AR003897–003907—to pursue speculative conservation outcomes outside the Absaroka-Beartooth Wilderness. This too improperly elevates public purposes, including those outside the Wilderness, over the agency's mandate to preserve wilderness character in violation of its duties under Section 1133(b) of the Wilderness Act.

The Recommendation appears to acknowledge this tension but never resolves it. It notes that "the Project would benefit conservation efforts beyond the wilderness boundary," but concludes this does not render its purpose invalid under the Wilderness Act. Recommendation at 21. That may be true when wilderness

benefits are primary and external benefits incidental. But here, the opposite is true: the primary benefits accrue to downstream ecosystems, while the wilderness itself bears the costs. This is not an incidental or secondary impact—the entire justification for the Project rests on external ecological outcomes. Section 1133(b) does not allow the Forest Service to authorize wilderness degradation in the pursuit of speculative benefits outside of the Wilderness.

D.   <u>Section 1133(c), and *Kofa's* two-step test applying it, does not apply to rotenone poisoning and fish stocking.</u>

The Ninth Circuit in *Kofa* ultimately found the agency authorization to install water guzzlers (structures) for bighorns unlawful under step two of the test. Conversely here, the Recommendation accepts the Forest Service's assertion that the Buffalo Creek Project serves a valid conservation purpose—specifically, to address downstream hybridization of Yellowstone cutthroat trout and establish a new population of Yellowstone cutthroat trout in the Wilderness—and concludes the extensive use of helicopters, motorized boats, chemical piscicides, and possibly ongoing fish stocking were the minimum actions necessary to pursue these goals. But while motorized uses, structures, and aircraft are properly assessed under Section 1133(c), the application of chemical piscicides and the stocking of fish do not implicate Section 1133(c). Rather, their legality is assessed under the Forest Service's duty to preserve wilderness character and administer the Wilderness

according to the mandates of the Wilderness Act. *See* 16 U.S.C. § 1133(b) (detailing the agency mandate); *Wilderness Soc'y*, 353 F.3d 1051, 1061–62 (9th Cir. 2003) (en banc) (describing the Act's "mandate to protect the forests, waters, and creatures of the wilderness in their natural, untrammeled state").

While the Recommendation acknowledged that "project nonconforming activities include the application of rotenone to eradicate rainbow trout, the use of mechanical equipment and motorized transportation, and the installation of temporary structures," Recommendation at 28-29, it erroneously wrapped its analysis of rotenone application into Section 1133(c) necessity standards. It found that "[g]iven the determination that no other method would achieve the [project] purpose, USFS has sufficiently established that rotenone is necessary for the purpose of YCT conservation." Recommendation at 29.

The agency's principal claim is that wilderness character will be improved by removing rainbow trout and restocking with genetically pure Yellowstone cutthroat trout. *See* Recommendation at 5 (citing AR002597). But Buffalo Creek is a historically fishless stream above a natural barrier. The agency's "improvement" consists of removing one human-introduced species and replacing it with another—not for wilderness restoration, but for regional fishery management goals—in violation of the Forest Service's mandate under Section 1133(b) and the Act's overarching preservation mandates defined in Sections 1131(a) and (c).

While the Recommendation erroneously wraps its consideration of rotenone application into its Section 1133(c) analysis, it completely and unlawfully severs the fish stocking component from judicial review. This is likely because the fish stocking component may be accomplished without motorized means, and thus more clearly presented problems for review under Section 1133(c) and *Kofa's* framework. However, an agency is not alleviated of its duties under Section 1133(b) simply because a wilderness degrading activity can be accomplished without motorized means.

## II. Erroneous Segmentation of Fish Stocking Component

The Recommendation unlawfully segments the Project into two components: (1) the eradication of rainbow trout using rotenone, motorized and mechanized equipment and transport, aircraft, and structures, and (2) the subsequent restocking of Yellowstone cutthroat trout. The Recommendation states that "YCT restocking by FWP is apparently authorized in other agreements" and notes FWP and the Forest Service "are signatories to the 2010 Cooperative Agreement for Fish, Wildlife and Habitat Management on National Forest Wilderness Lands in Montana." Recommendation at 7. However, if this statement is flagging jurisdictional concerns, they are not analyzed anywhere in the

Recommendation.[3] Instead, the Recommendation simply declines to analyze the

stocking portion of the project, noting:

> [T]his Court does not find it necessary to determine USFS's
> authority regarding state efforts to restock YCT using primitive
> means. While the project clearly envisions restocking, efforts to
> that end are distinct from Project activities intended to eradicate
> rainbow trout from Buffalo Creek … [and] preventing
> hybridization is a sufficient and independent justification for
> otherwise nonconforming project activities.
>
> […] Therefore, because the requirements of § 1133(c) have
> been met as to the goal of preventing hybridization (and the
> purpose of YCT conservation) it is not necessary to consider
> whether the remaining project goals would also sustain the
> exception.

Recommendation at 31-32.

---

[3] The Cooperative Agreement is a set of policies and guidelines developed to promote cooperation between the agencies, and it sets "a standard process for addressing fish, wildlife and habitat management proposals and resolving related issues raised by either agency." AR015821 (Although the Recommendation cites the "2010" Agreement, the Agreement in the AR is dated 2008). The Agreement, which was not subject to public notice and comment, does not constitute final agency action or, alternatively, it would not be ripe for judicial review without site-specific implementation. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733-34 (1998); *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1067 (9th Cir.); *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006); *see also* ECF 17, Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment at 28-29.

Where the Agreement is not a final agency action reviewable under the APA and ripe for judicial review, and if the current decision likewise disclaims fish stocking as part of the project, it is unclear when—if ever—Plaintiffs could challenge fish stocking in wilderness. Excluding fish stocking from judicial review improperly shields a core part of the project from scrutiny under the Wilderness Act.

This rationale demonstrates the confused results that flow from an improperly broad application of *Kofa*. Stocking fish in naturally fishless wilderness waters fundamentally undermines the Forest Service's "mandate to protect the forests, waters, and creatures of the wilderness in their natural, untrammeled state." *Wilderness Soc'y*, 353 F.3d at 1055. Whether analyzing such an activity under Section 1133(c)'s exception for prohibited activities (a section that does not apply to fish stocking because it is not one of the enumerated activities in that section) or under the agency's broad duties in Section 1133(b) to preserve wilderness character, such an outcome can only occur if the Forest Service is permitted to elevate the Act's public purposes over the Act's overarching mandate—the "either / or" scenario promoted in the Recommendation and clearly rejected in *Blackwell*. 390 F. 3d at 647-48.

The Recommendation also makes erroneous factual findings. It finds that "restocking is irrelevant to the goal of removing rainbow trout from Buffalo Creek," Recommendation at 30, but the record—including the Project EA and Final Decision Notice—makes clear that the Project was conceived as an integrated effort: removing one species to replace it with another in order to establish a genetically pure Yellowstone cutthroat trout population. *See* ECF 17 at 9, 24; ECF 24 at 17–18 (referring to CM/ECF pagination); AR002606, 004132. The Final EA states unequivocally that "FWP would not have pursued this project

without the end goal of replacing rainbow trout with self-sustaining Yellowstone cutthroat trout," in large part to benefit sport fishing. AR002808.

The Buffalo Creek watershed in the Wilderness historically supported a rich biotic community—birds, amphibians, invertebrates, and other aquatic species—but not fish. AR002606. All of these organisms would be affected by the Project. AR002647–002655. Restocking the area with fish following such widespread disruption (rotenone is particularly harmful to zooplankton, macroinvertebrates, and amphibians) does not preserve the area's untrammeled, natural character. AR002598, 002622, 002675, 002785. These organisms form the base of the aquatic and terrestrial food web and play a critical role in sustaining the natural, self-willed qualities the Wilderness Act was enacted to protect. AR008029.

Although the Final EA acknowledges that rotenone harms amphibians and aquatic invertebrates, it minimizes the severity of those effects. The agency emphasizes presumed recovery and seasonal timing—suggesting that many tadpoles would not survive the winter regardless. *See* AR002651. But the record reveals scientific uncertainty and mortality among non-target species, including complete tadpole die-offs within 24 hours of treatment and substantial impacts to sensitive macroinvertebrates. *See* AR008017-008026. These are not incidental effects—they represent a fundamental disruption of the aquatic food web in a

naturally fishless wilderness, inconsistent with the Wilderness Act's mandate to protect such systems in their untrammeled state.

Native invertebrates and amphibians, and the other species who rely on aquatic systems for food, would derive greater benefit from the natural absence of predators than from replacing one human-introduced trout with another. The research that the Forest Service relied upon indeed recognized as much: "salmonids introduced into fishless lakes . . . apparently reduced insect emergence up to 92%, which led to 90% fewer frogs and 82% fewer birds." AR007917. Accordingly, the deference afforded in *Kofa* on this issue is inapplicable here.

Stocking fish in naturally fishless waters degrades the natural, untrammeled character of the Wilderness. This is not ecological restoration—it is continued manipulation. The Wilderness Act does not authorize agencies to engineer preferred biological outcomes in wilderness. It requires deference to natural conditions, even if those conditions include the legacy of past human errors.

This action lies at the heart of Plaintiff's legal challenge and represents a broad precedential threat to Wilderness administration nationwide. The Forest Service has an express statutory duty to preserve wilderness character and to "administer such area for such other purposes for which it may have been established as also to preserve its wilderness character," 16 U.S.C. § 1133(b). Even if FWP seeks to carry out the stocking without the aid of prohibited means, the

Forest Service retains its legal responsibility to administer the Absaroka-Beartooth Wilderness in accordance with the Wilderness Act. It cannot abdicate this duty by deferring to state management goals. 16 U.S.C. § 1133(b); *see Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170, 1181-82 (D. Idaho 2017) ("While this language preserves a state's right to manage wildlife in the Wilderness Area, Congress did not mean 'to eviscerate the primacy of federal authority' over the Wilderness Area."). Standard principles of federal preemption mean that Congress's statutory directives for Wilderness administration, "together with the policies and objectives encompassed therein, necessarily override and preempt conflicting state laws, policies, and objectives." *Wyoming v. U.S.*, 279 F.3d 1214, 1227 (10th Cir. 2002).

Judge DeSoto erred in allowing the Forest Service to abdicate its federal duties under the Wilderness Act. The result was an incomplete evaluation that circumvented meaningful review and painted an incomplete picture of the project's true scope and impact. *See* 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117, 1134 (E.D. Cal. 2006). It also deprived Plaintiff of a potential remedy under the law—an order finding the stocking portion of the project unlawful even if the removal portion is upheld.

## III.  Improper Deference to Forest Service's Authorization of the Alternative Most Harmful to Wilderness Character

The problems with the Recommendation's overextension of *Kofa* and the resulting "either / or" standard culminate in the Recommendation's improper deference to the Forest Service's  authorization of the alternative most harmful to wilderness character. The Project entails a stunning amount of intensive motorized and mechanical intrusions and other wilderness degrading activities in the Wilderness—an amount rarely seen in Wilderness. The project includes up to five years of rotenone application across 46 miles of streams and over 30 acres of lakes and wetlands. AR002820-002829. The Forest Service approved transporting project personnel to work sites in the Wilderness by helicopter, erecting a radio repeater in the Wilderness for use during project activity, helicopter landings for delivery of over 12,000 pounds of equipment and rotenone into the Wilderness, and the erection of three remote field camps and delivery of over 6,000 pounds of gear each summer to support these camps. AR002824.

To spread rotenone, the Forest Service approved aerial broadcasting of the poison over 25 acres of open water and the use of gasoline-powered pumps. AR002825. The Forest Service also approved the construction of fish barriers at the outlet of Hidden Lake, using material wrapped in irrigation tarp, to persist for up to five years. AR002824-002825. In total, the Forest Service approved up to 60

days of motorized use including up to 81 aircraft landings in the Wilderness.
AR002826.

The agency's own Minimum Requirements Decision Guide (MRDG)
concluded that all project alternatives, including the one selected—which had the
greatest detrimental impact on wilderness character—would result in damage to
the Absaroka-Beartooth Wilderness, or in the vernacular of the MRDG, negative
wilderness character scores. AR003907. The MRDG explains that "[r]otenone
treatment of lakes, ponds, and wetlands would have a trammeling effect," and that
"[fish] stocking and the use of [temporary installments] are considered trammeling
actions." AR003868. It also notes that the "[u]se of motor vehicles, motorized
equipment, or mechanical transport degrades the undeveloped quality" of
Wilderness and that constructing man-made fish barriers and using helicopters,
generators, and other motors would negatively affect wilderness character.
AR003869-003871. Although these statements appear under Alternative 2, the
same action and impacts are common to all alternatives analyzed, including the
selected alternative.

Ultimately, deploying its own internal scoring system, the Forest Service
gave the "aircraft and pack stock supported" alternative that it approved a "-15,"
documenting a net detriment to wilderness character. AR003907. The "no action"
alternative received a score of "-1," reflecting a minor impact on wilderness

character due to the extant presence of rainbow trout but an overall lower impact than the implementation of the project. *Id*. Yet the Forest Service chose the most wilderness degrading alternative to support a conservation project where benefits occur almost entirely outside the wilderness.

Judge DeSoto accepted the agency's conclusion without conducting the "searching and careful" review the APA demands. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Courts must determine whether the agency considered relevant factors and avoided clear error in judgment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Court gave undue weight to the agency's preference for efficiency and project success at the expense of its statutory duties to preserve wilderness character. A project that by every score degrades wilderness character cannot be deemed "necessary to meet minimum requirements" for protecting that Wilderness or be in line with the agency's mandate to preserve wilderness character. *See Blackwell*, 390 F. 3d at 647 ("The limitation on the Forest Service's discretion to authorize [wilderness degrading activities] flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas."). The Recommendation's adoption of the Forest Service's rationale was in error and should be reversed.

## IV.  Deference to the Forest Service's interpretation of the Wilderness Act is no longer appropriate.

Finally, to the extent the Magistrate deferred to the Forest Service's interpretation of the Wilderness Act—including its understanding of the statute's purposes or the minimum necessary standard—such deference is no longer permitted. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–94 (2024). Courts must exercise their independent judgment when interpreting federal statutes, and cannot defer to an agency's construction merely because it is charged with administering the statute.

While the Recommendation acknowledges *Loper Bright* and purports to apply *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), its reasoning nonetheless reflects unwarranted deference. The Recommendation adopts the Forest Service's assertions of necessity and purpose when the agency's interpretation is in fact unpersuasive, inconsistent, and grounded in invalid reasoning. *See Skidmore*, 323 U.S. at 140 (agency views are entitled to weight only to the extent they have "the power to persuade"). By treating the agency's preference for project efficiency and biological outcomes as effectively dispositive of the statutory inquiry, the Recommendation improperly elevated administrative convenience over the Wilderness Act's preservation mandate—effectively applying *Chevron*-style

deference in practice, even while disclaiming it in theory. This error further underscores the need for de novo review.

## CONCLUSION

For the foregoing reasons, Plaintiff Wilderness Watch respectfully requests that the Court reject the Magistrate Judge's Findings and Recommendation in full. The Forest Service's approval of the Buffalo Creek Project violates the plain terms of the Wilderness Act, fails to meet the APA's reasoned decision-making requirement, and relies on an interpretation of *Kofa* that cannot be reconciled with Ninth Circuit precedent or the Wilderness Act's central preservation mandate.

Accordingly, this Court should grant the relief requested in Plaintiff's Complaint for Declaratory and Injunctive Relief. ECF Doc. 1. In the alternative, Plaintiff respectfully requests that the Court remand the matter to Magistrate Judge DeSoto for reconsideration consistent with the Wilderness Act, the APA, and the governing legal standards described herein.

Respectfully submitted this 11th day of April, 2025.

/s/ *Daniel Brister*
Daniel Brister
Attorney for Plaintiff

/s/ *Dana Johnson*
Dana Johnson
Attorney for Plaintiff

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief is 6,023 words in length, excluding the caption, table of contents, table of authorities, signature blocks, and certificate of compliance. Pursuant to Local Rule 7.1, a table of contents, table of authorities, and index of exhibits are included in this brief.

/s/ *Daniel Brister*
Daniel Brister
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that I served a true and accurate copy of this document by filing it with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/ *Daniel Brister*
Daniel Brister
Attorney for Plaintiff