ADAM R.F. GUSTAFSON
United States Department of Justice
Acting Assistant Attorney General
Environment & Natural Resources Division

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Phone: (202) 532-5973
shaun.pettigrew@usdoj.gov

*Counsel for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| WILDERNESS WATCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:23-cv-00133-DLC-KLD |
| v. | ) | |
| | ) | DEFENDANT'S RESPONSE TO |
| UNITED STATES FOREST | ) | PLAINTIFF'S OBJECTIONS TO |
| SERVICE, an agency of the U.S. | ) | FINDINGS AND |
| Department of Agriculture, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.    BACKGROUND ....................................................................................2

    A.    The Wilderness Act ....................................................................2

    B.    Factual Background.....................................................................4

    C.    Procedural Background ...............................................................7

III.   STANDARD OF REVIEW .....................................................................8

IV.   ARGUMENT........................................................................................10

    A.    The Forest Service fully supported its authorization of nonconforming uses to remove rainbow trout from the Buffalo Creek subwatershed................................................................10

        1.    The F&R correctly found that conservation of YCT was a purpose of the Wilderness Act....................................................10

        2.    The F&R correctly found that removal of rainbow trout from the Buffalo Creek subwatershed was necessary to the conservation of YCT and that the Project's authorized nonconforming uses were necessary to achieve that removal..................................................................................20

    B.    Section 1133(c) does not apply to restocking YCT in the Buffalo Creek subwatershed and such restocking is consistent with the Wilderness Act's conservation purpose and the preservation of wilderness character .........................................................24

CONCLUSION ....................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Californians for Alternatives to Toxics v. U.S. Fish and Wildlife Service*,
  814 F. Supp. 2d 992 (E.D. Cal. 2011) ........................................................... 11, 26

*High Sierra Hikers Ass'n v. Blackwell*,
  390 F.3d 630 (9th Cir. 2004) ................................................................... 9, 15, 16

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ...................................................................................25

*McFarland v. Kempthorne*,
  545 F.3d 1106 (9th Cir. 2008) ...................................................................9

*Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) ...................................................................9

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ............................................................................... 15, 16

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
  353 F.3d 1051 (9th Cir. 2003) ................................................................. 19, 26

*Wilderness Watch v. Iwamoto*,
  853 F. Supp. 2d 1063 (W.D. Wash. 2012) ................................................. 12, 18

*Wilderness Watch, Inc. v. Creachbaum*,
  225 F. Supp. 3d 1192 (W.D. Wash. 2016) .............................................. 11, 12, 23

*Wilderness Watch, Inc. v. Creachbaum*,
  731 F. App'x 709 (9th Cir. 2018) ............................................................. 12, 23

*Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv. (Kofa)*,
  629 F.3d 1024 (9th Cir. 2010) .............................................................. passim

## Statutes

16 U.S.C § 1131(b) ..............................................................................3

16 U.S.C. § 1131(a) ...........................................................................2, 3

16 U.S.C. § 1131(c) ....................................................................... 1, 18, 19

16 U.S.C. § 1133(b) ................................................................ 3, 10, 15, 26

16 U.S.C. § 1133(c) ....................................................................... passim

16 U.S.C. § 1133(d)(1)-(5) ................................................................................ 3

16 U.S.C. § 1133(d)(7) .................................................................................... 25

28 U.S.C. § 636(b)(1)(C) ................................................................................ 9

5 U.S.C. § 706(2)(A) ...................................................................................... 9

**Rules**

Fed. R. Civ. P. 72(b)(3) .................................................................................. 9

L.R. 72.3(a)(1)-(2) ......................................................................................... 9

**Other Authorities**

123 Cong. Rec. 18426 (1977) ........................................................................ 14

H.R. Rep. No. 95-27 (1978) ........................................................................... 13

S. Rep. No. 95-624 (1978) ............................................................................. 14

## I.    INTRODUCTION

Plaintiff brings this action ostensibly in the name of wilderness preservation. But Plaintiff's myopic view of the Wilderness Act would force the U.S. Forest Service (USFS) to retain introduced nonnative rainbow trout in the Absaroka-Beartooth Wilderness that provide the sole source of introgression threatening native Yellowstone cutthroat trout (YCT) throughout all 352 stream miles in the Lamar River watershed—including Slough Creek within the Wilderness—and to prohibit Montana Fish, Wildlife, and Parks (FWP) from restocking YCT in an area secure from future introgression.

Neither the text of the Wilderness Act nor binding Ninth Circuit precedent support Plaintiff's view. The Wilderness Act provides for conservation uses of wilderness areas and the Ninth Circuit has confirmed an agency's judgment and discretion in balancing these uses against preservation of wilderness character. Further, removing invasive rainbow trout and restocking YCT in the Absaroka-Beartooth Wilderness promotes the area's wilderness character by preserving the area's "natural conditions" such that the area "generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." 16 U.S.C. § 1131(c).

Because conservation of YCT is consistent with the purposes of the Wilderness Act, the only issue is whether the authorized methods of YCT

conservation are permissible under the Act. They are. USFS reasonably determined that removal of rainbow trout from the subwatershed through motorized use, helicopter landings, and temporary fish barriers is "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." 16 U.S.C. § 1133(c). And FWP will restock YCT in the Buffalo Creek subwatershed using primitive means that are not prohibited by the Wilderness Act.

The Court should affirm the Magistrate Judge's finding that "USFS has demonstrated (1) the Project serves the valid purpose of conservation of YCT, and (2) the otherwise prohibited activities are necessary for the minimum administration of that purpose," and adopt the Magistrate Judge's recommendation to deny Plaintiff's motion for summary judgment and grant Defendant's cross-motion. Findings & Recommendation (F&R) 32-33, ECF No. 31.

## II.   BACKGROUND

### A.    The Wilderness Act

The Wilderness Act declared a policy "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). To do this, Congress established the National Wilderness Preservation System, comprising federally owned lands designated by Congress as "wilderness areas" to "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment

as wilderness," and to preserve their "wilderness character." *Id.* Designated wilderness areas remain under the jurisdiction of the agency with jurisdiction over the lands just before wilderness designation. 16 U.S.C § 1131(b).

"[E]ach agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area," and "wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b). These provisions reflect "competing" or "conflicting" instructions to which the managing agency must apply "judgment and discretion." *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv. (Kofa)*, 629 F.3d 1024, 1033-34 (9th Cir. 2010). In doing so, an administering agency "must preserve the wilderness character of the area while at the same time providing for 'recreational, scenic, scientific, educational, conservation, and historical use.'" *Id.* at 1034 (quoting 16 U.S.C. § 1133(b)).

In managing wilderness areas, Congress generally prohibited any "commercial enterprise" or "permanent road within any wilderness area," subject to certain special provisions related to, among other things, fire, insects, disease, minerals, water resources, grazing, and commercial services. 16 U.S.C. § 1133(c), (d)(1)-(5). Congress further prohibited "temporary road[s]," "use of motor vehicles, motorized equipment or motorboats," "landing of aircraft," other forms "of mechanical transport," and any "structure[s] or installation[s]" in wilderness

areas. 16 U.S.C. § 1133(c). But a general exception applies, allowing federal agencies managing wilderness areas to authorize these nonconforming actions "as necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id.*

### B.    Factual Background

YCT historically existed across Montana, Idaho, Wyoming, Utah, and Nevada. Def.'s Stmt. of Undisputed Facts (SOF) ¶ 1, ECF No. 21. The species now remains in less than half of its historic range, and in only about one-third of its historic range in Montana. SOF ¶ 2. The primary threat to YCT comes from genetic hybridization with non-native rainbow trout that have been introduced and spread throughout much of YCT's historic range. SOF ¶ 3.

State and federal officials have agreed to implement conservation projects that are intended to prevent the need to list YCT as threatened or endangered under the ESA. SOF ¶¶ 4-8. As noted in one of these agreements between FWP and various federal agencies, "[r]emoval of nonnative fishes, followed by reintroduction of native cutthroat trout, has been a vital tool in cutthroat trout conservation, and will be used to restore Yellowstone cutthroat trout populations in Montana." SOF ¶ 8.

Nowhere is the threat hybridization poses to YCT more apparent than in the Lamar River watershed within the Yellowstone River basin, where "hybridization

4

threatens the entire Lamar River population of cutthroat trout found in 352 stream miles in the basin." SOF ¶ 23. A recent study found that rainbow trout stocked in the Buffalo Creek subwatershed in the 1930s is likely "the single contemporary source of rainbow trout in the (Lamar) watershed."[1] SOF ¶¶ 22, 23. That subwatershed is just north of Yellowstone National Park in the Absaroka-Beartooth Wilderness designated by Congress in 1978 and managed by the Custer-Gallatin National Forest. SOF ¶¶ 9-12.

Recognizing a unique opportunity to remove the source population of rainbow trout threatening YCT in the Lamar River watershed (including Slough Creek in the Absaroka-Beartooth Wilderness), FWP proposed a project that would apply rotenone, a naturally occurring fish toxicant, to remove the entire population of rainbow trout in the Buffalo Creek subwatershed. SOF ¶¶ 23, 24. FWP would then restock the waters previously occupied by invasive rainbow trout with "genetically pure native Yellowstone cutthroat trout." *Id.*

The "primary goal" of the proposal would be to protect YCT's genetic integrity in the Lamar River watershed by removing the source population of rainbow trout and thereby "improving the natural quality of wilderness character that is degraded by the presence of a nonnative and functionally invasive fish species." SOF ¶ 25. But the proposed project would also have a secondary benefit.

---

[1] YCT were also stocked in the subwaterhsed in the 1920s and 1940s. SOF ¶ 22.

A barrier cascade exists on Buffalo Creek at the boundary of Yellowstone National Park that would prevent the upstream movement of rainbow trout or its hybrids from elsewhere in the watershed. SOF ¶¶ 21, 25. Restocking that area with YCT after removing rainbow trout would "establish a secure population of nonhybridized Yellowstone cutthroat trout in Buffalo Creek," which is particularly important because "that area is at high elevation and predicted to remain thermally suitable for Yellowstone cutthroat trout for the foreseeable future." SOF ¶ 25. "Replacing rainbow trout with genetically pure YCT in 46 wilderness stream miles in the Buffalo Creek drainage presents the single greatest opportunity in the Yellowstone Headwaters Subbasin for establishing a genetically pure YCT metapopulation, secure above a natural barrier, from hybridization, disease, disturbance, and climate threats." SOF ¶ 26.

Because FWP's proposed project would occur within the Absaroka Beartooth Wilderness, USFS had to decide whether to authorize application of the rotenone and any other actions—such as motorized equipment, aircraft landings, motorboats, or installations—that are generally prohibited in wilderness areas "except as necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." 16 U.S.C. § 1133(c); SOF ¶ 27. USFS prepared an extensive Minimum Requirements Decision Guide (MRDG) to inform its decision. SOF ¶ 28. Based on that analysis, USFS found FWP could

restock the YCT through primitive means that would not require any

nonconforming actions. SOF ¶¶ 28, 29. But USFS found application of the

rotenone would require motorized equipment, helicopter landings, and

installations, detailing the specific minimum necessary actions. SOF ¶¶ 29, 30.

USFS issued a Final Decision Notice in August 2023 for the Buffalo Creek

Yellowstone Cutthroat Trout Conservation Project (Project), approving the

removal of rainbow trout from the Buffalo Creek subwatershed through the

application of rotenone using motorized equipment, helicopter landings, and fish

barriers. SOF ¶¶ 32-34. Because FWP must restock the Buffalo Creek

subwatershed with YCT through primitive means, USFS did not need to separately

authorize that activity. SOF ¶ 32.

### C.   Procedural Background

Plaintiff brought this action asserting a claim under the Wilderness Act.

Compl. ¶¶ 100-103, ECF No. 1. That claim was premised entirely on Plaintiff's

theory that the Wilderness Act serves a singular overriding purpose of preserving

wilderness character and that removing rainbow trout (a species that was not native

to the Absaroka Beartooth Wilderness) and restocking Buffalo Creek with YCT (a

species that had been stocked in the Buffalo Creek subwatershed before

designation of the wilderness and that was native to the area) somehow diminished

the wilderness character of the area. *See, e.g.*, Pl.'s Mem. in Supp. Mot. for Summ.

J. (Pl.'s Br.) 12-16, ECF No. 17.

On March 21, 2025, the Magistrate Judge issued an F&R properly rejecting

that view as inconsistent with Ninth Circuit precedent, finding that conservation of

YCT furthered a purpose of the Wilderness Act. F&R 12-17. The F&R further

explained that the authorized nonconforming activities were proper under 16

U.S.C. § 1133(c) because addressing the genetic integrity of YCT was necessary

for the conservation of YCT in the Lamar River watershed, removal of rainbow

trout in the Buffalo Creek subwatershed was necessary to address YCT genetic

integrity, and the approved nonconforming activities were necessary to remove the

rainbow trout. *Id.* at 23-32. Based on these findings, the Magistrate Judge

recommended that Plaintiff's motion for summary judgment be denied and

Defendant's cross-motion be granted. F&R 33. Plaintiff objected. Pl.'s Obj. to

Mag. J. F&R (Obj.), ECF No. 34.

## III.    STANDARD OF REVIEW

A party objecting to a magistrate judge's findings and recommendations

must "itemize each factual finding of the magistrate judge to which objection is

made, identifying the evidence in the record the party relies on to contradict that

finding," and "itemize each recommendation of the magistrate judge to which

objection is made, setting forth the authority the party relies on to contradict that

recommendation." D. Mont. LR 72.3(a)(1)-(2). The district judge "make[s] a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).

The Administrative Procedure Act (APA) governs judicial review of agency action under the Wilderness Act. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citation omitted). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosys. All. v U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

IV.    **ARGUMENT**

    A.    **The Forest Service fully supported its authorization of nonconforming uses to remove rainbow trout from the Buffalo Creek subwatershed.**

        1.    **The F&R correctly found that conservation of YCT was a purpose of the Wilderness Act.**

The Wilderness Act provides that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area," and that "wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b). These provisions reflect "competing" or "conflicting" instructions in managing wilderness areas to which the managing agency must apply "judgment and discretion." *Kofa*, 629 F.3d at 1033-34. In applying that judgment and discretion, USFS "must preserve the wilderness character of the area while at the same time providing for 'recreational, scenic, scientific, educational, conservation, and historical use.'" *Id.* at 1034 (quoting 16 U.S.C. § 1133(b)).

Plaintiff dislikes this interpretation of the Wilderness Act, preferring an interpretation that subordinates section 1133(b)'s enumerated purposes to "wilderness character." *See* Obj. 8 ("[P]reservation of wilderness character is the overarching value of the statute."). And although Plaintiff claims it "is not asking this Court to render a decision that runs counter to *Kofa* or other Ninth Circuit precedent," that is precisely what Plaintiff is requesting. Obj. 6-7. Under the Ninth

Circuit's binding interpretation, conservation is one purpose among others for which the Forest Service is to administer the Wilderness Act under section 1133(b). F&R 14 ("Recognizing the direct applicability of binding Ninth Circuit precedent, this Court will apply the *Kofa* framework[.]").

Courts following *Kofa* have made this clear. For example, the court in *Californians for Alternatives to Toxics v. U.S. Fish and Wildlife Service*, 814 F. Supp. 2d 992, 1014-16 (E.D. Cal. 2011), applied *Kofa* to correctly find that Paiute cutthroat trout conservation was consistent with the Wilderness Act.[2] And in a related context, the court in *Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192 (W.D. Wash. 2016), relied on *Kofa* to expressly reject Plaintiff's preferred interpretation of the Wilderness Act.

There, Plaintiff argued that the Wilderness Act forbid the National Park Service (NPS) from "preserving historic structures in wilderness," claiming the agency could not act to "prevent[] structures' natural deterioration." *Id.* at 1197. As the court summarized:

---

[2] The court found USFS had not sufficiently considered "the potential extinction of native invertebrate species as a factor relevant to the decision of whether the extent of the [use of motorized equipment otherwise prohibited under section 1133(c)] was necessary." *Californians for Alternatives to Toxics*, 814 F. Supp. 2d at 1019. Plaintiff does not make a similar argument here and the EA considered potential effects on aquatic invertebrates. AR002653-56. The court in *Californians for Alternatives to Toxics* later lifted the injunction after the Forest Service prepared a revised Minimum Requirements Decision Guide. *See* ECF No. 25-1.

> Wilderness Watch argues loftily that the Park Service's decision to preserve historical structures violates the Wilderness Act because the Act only permits structures in wilderness if they further the Act's singular purpose: wilderness preservation. It argues that as a "public purpose" of wilderness, "historical use" is subservient to the Act's overarching ambition of preserving wilderness as wilderness.

*Id.* at 1201. The court correctly rejected this interpretation, explaining that the "tension" noted in *Kofa* "between the Act's conflicting policy directives in Sections 1131 and 1133 creates an ambiguity warranting deference to the Park Service's interpretation" that "historic preservation furthers a goal of the Wilderness Act." *Id.* at 1204-05; *see also Wilderness Watch v. Iwamoto*, 853 F. Supp. 2d 1063, 1074 (W.D. Wash. 2012) (same). The Ninth Circuit affirmed, reiterating that "[i]n *Kofa*, we held that the Wilderness Act gives agencies conflicting policy directives by directing them to preserve wilderness while at the same time providing for recreational, scenic, scientific, educational, conservation, and historical use, and that this conflict rendered 'conservation' ambiguous." *Wilderness Watch, Inc. v. Creachbaum*, 731 F. App'x 709, 711 (9th Cir. 2018) (quotations omitted).

Recognition of the competing or conflicting instructions in the Wilderness Act does not, as Plaintiff previously argued, have the absurd result of allowing the Forest Service to "pave an RV park into designated wilderness in the name of 'recreational' use" or "erect a campus of NASA offices in the name of 'scientific' use." Pl.'s Reply 7, ECF No. 24. There must still be some connection between the

use and the designated wilderness area. In *Kofa*, conservation of bighorn sheep in the area provided that connection. In *Californians for Alternatives to Toxics*, conservation of Paiute cutthroat trout in the area provided that connection. And in *Creachbaum* and *Iwamoto*, preservation of historic structures that predated wilderness designation of the areas provided that connection.

Conservation of YCT provides that connection here. YCT historically ranged throughout the Yellowstone River basin, including the Lamar River watershed and subwatersheds within the area designated as the Absaroka-Beartooth Wilderness, and YCT were stocked in the Buffalo Creek subwatershed decades before designation of the wilderness area. SOF ¶¶ 1-2, 10-11, 20. It is an iconic species in the area and the only native trout. AR002596; AR020258.

As the House Report explained, the area designated as the Absaroka-Beartooth Wilderness "is an integral part of the Yellowstone ecosystem," and wilderness designation "will provide protection for major watersheds flowing south into [Yellowstone National Park]," including the "three major streams and five lakes with trout fisheries," and "go a long way toward insuring that the Yellowstone ecosystem is preserved in its natural state for future generations of Americans to enjoy." H.R. Rep. No. 95-27, at 1-2, 7 (1978), ECF No. 25-2.

The Senate Report emphasized that the area "is a major quality watershed for the Yellowstone River, one of America's finest blue-ribbon trout streams." S.

13

Rep. No. 95-624, at 1 (1978), ECF No. 25-3. And when proposing the bill to

designate the Absaroka-Beartooth Wilderness, Senator Metcalf from Montana

emphasized the "irreplaceable habitat for many species of wildlife that require an

essentially wilderness environment to prosper," 123 Cong. Rec. 18426 (1977),

ECF No. 25-4. In listing these species, Senator Metcalf mentioned only a single

aquatic species: "cutthroat trout." *Id.*

    The USFS report proposing wilderness designation of the area also noted the

presence of YCT, SOF ¶ 10, and emphasized the "overwhelming public support"

for a large unified wilderness that included "the Slough-Abundance Creek

Corridor," to which Buffalo Creek is a tributary, because it "would provide the best

form of habitat protection for wildlife and fisheries in that area," AR016347;

AR003988 ("Buffalo Creek is a tributary to Slough Creek in the greater Lamar

River drainage."); SOF ¶ 21. And NPS noted a specific interest in including Slough

Creek in the designation because it contained "one of the remnant populations of

the stream-bred native Yellowstone cutthroat trout." AR016392.

    That remnant population in the Absaroka-Beartooth Wilderness, along with

the rest of the YCT population in the Lamar River watershed, is now threatened by

introgression originating from rainbow trout in the Buffalo Creek subwatershed,

and the Forest Service has determined that conservation measures are needed to

protect the species. SOF ¶ 23 ("Invasion of rainbow trout into upper Slough Creek

was discovered in the 2000s."). Just as in *Kofa*, *Californians for Alternatives to Toxics*, *Creachbaum*, and *Iwamoto*, the Forest Service's determination that conservation of YCT in the Absaroka-Beartooth Wilderness is consistent with the enumerated purposes of the Wilderness Act was entirely reasonable.

Indeed, as the F&R emphasized, "the administrative record shows a consistent history of USFS efforts to conserve YCT in the Project area," which "weighs in favor of USFS' interpretation of its responsibilities and limitations under the Wilderness Act." F&R 21; *see also* SOF ¶¶ 1-8 (detailing conservation efforts). Similarly, "USFS' approach to the Project also demonstrates thoroughness, further weighing in favor of the Agency's interpretation of its responsibilities under the Wilderness Act." F&R 22. Based on this, the F&R properly relied on *Skidmore* to find that "conservation of YCT, as manifest in the Project, is consistent with statutory purposes for the administration of wilderness under 16 U.S.C. § 1133(b)." F&R 23; *see id.* at 17-18 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Plaintiff's reliance on *Blackwell* to argue for its preferred interpretation of the Wilderness Act is misplaced. Obj. 9-11. That case also acknowledged that "[w]hen administering a wilderness area, the Forest Service must balance many competing interests." *Blackwell*, 390 F.3d at 647. And, relying on *Blackwell*, *Kofa* made clear that "the purpose of the Wilderness Act with regard to conservation is

ambiguous." 629 F.3d at 1033 (citing *Blackwell*, 390 F.3d at 647-48). USFS's interpretation of the purpose of the Wilderness Act to include YCT conservation is persuasive, as the F&R correctly found.

Plaintiff nevertheless argues that rather than applying *Skidmore*, the Magistrate Judge "effectively appl[ied] *Chevron*-style deference in practice, even while disclaiming it in theory." Obj. 25-26. The F&R belies Plaintiff's unsupported assertion. Just as in *Kofa*, the F&R properly considered "the thoroughness evident in [the agency's] consideration, the validity of its reasoning" and "its consistency with earlier and later pronouncements," in finding USFS's interpretation persuasive. F&R 18 (quoting *Skidmore*, 323 U.S. at 140); *see Kofa*, 629 F.3d at 1035 (applying *Skidmore* deference). The F&R correctly found that YCT conservation is a purpose of the Wilderness Act under section 1133(b).

Plaintiff also maintains that the Wilderness Act forecloses conservation efforts within a wilderness area the effects of which will fall outside of that area. Obj. 13-14. This argument is misguided for two reasons. First, removing rainbow trout from the Buffalo Creek subwatershed will have substantial benefits within the Absaroka-Beartooth Wilderness by preventing further introgression in the wilderness area itself. As noted above, Slough Creek was included in the wilderness area because it contained "one of the remnant populations of the stream-bred native Yellowstone cutthroat trout." AR016392. But introgression

from the source population of rainbow trout in the Buffalo Creek subwatershed is threatening that population. *See* AR002611 ("Invasion of rainbow trout into upper Slough Creek was discovered in the 2000s."). Removal of the source of this introgression will benefit YCT in the wilderness area.

Second, as the F&R correctly found, "the fact that the Project would benefit conservation efforts beyond the wilderness boundary does not substantiate [Plaintiff's] argument that the Project fails to serve a valid purpose under the Wilderness Act." F&R 21. Plaintiff's objections "fail[] to cite caselaw to show that any conservation purpose yielding benefits outside wilderness is foreclosed by the Wilderness Act." *Id.* "Rather, it should be expected that the benefits of a project serving a wildlife conservation purpose might cross administrative boundaries as individual animals migrate in or out of designated wilderness." *Id.*

Finally, if a conflict existed between conserving YCT and preserving the wilderness character of the area, USFS's "application of judgment and discretion" to approve YCT conservation measures would be subject to deference. *Kofa*, 629 F.3d at 1033. But this is not a case that involves competing or conflicting instructions. USFS reasonably determined that removal of nonnative rainbow trout also preserves the wilderness character of the area. AR002834. This finding is fully supported by USFS's reasoned analysis. As *Iwamoto* anticipated, "one might imagine that agency action furthering the goals of conservation would be *less*

17

likely to conflict with the overriding goal of wilderness preservation than action furthering other referenced uses [in section 1133(b)]." 853 F. Supp. 2d at 1074.

In arguing otherwise, Plaintiff quotes the definition of wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." Obj. 8 (quoting 16 U.S.C. § 1131(c)). Plaintiff maintains that this reference to "untrammeled" means that the Wilderness Act forbids "human manipulation of ecological processes within designated wilderness" and guarantees "the freedom of natural systems from purposeful human control, interference, and meddling." Obj. 8. But this interpretation directly contradicts *Kofa*, which explained that a wilderness area is not "a museum diorama" to be observed "only from a safe distance, behind a brass railing and a thick glass window. Instead, Congress stated that the wilderness was to be preserved as wilderness and made accessible to people, 'devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.'" *Kofa*, 629 F.3d at 1033.

Further, Plaintiff ignores the Wilderness Act's more specific definition of wilderness as an area of "undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and *managed so as to preserve its natural conditions* and which . . . generally appears to have been affected primarily by the forces of nature, with the

18

imprint of man's work substantially unnoticeable." 16 U.S.C. § 1131(c) (emphasis

added); *see Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1061-

62 (9th Cir. 2003) (en banc) (noting Wilderness Act's "broad mandate to protect

the forests, waters and creatures of the wilderness in their *natural*, untrammeled

state." (emphasis added)). As USFS explained, untrammeled and natural have

different meanings. Untrammeled "means that wilderness is essentially unhindered

and free from the intentional actions of modern human control or manipulation,"

AR015639, whereas natural conditions reflect "indigenous species compositions,

structures, and functions of the wilderness," AR015645.

Rainbow trout in the Buffalo Creek subwatershed degrade the wilderness

area's natural condition. *See* AR003845. It is an introduced non-native species that

threatens native YCT throughout the Lamar River watershed and continues to

constrict the YCT's shrinking historic range. SOF ¶¶ 2, 3, 23. USFS reasonably

determined that removal of those trout promotes the natural condition of the area

and contributes to its wilderness character. *See* AR003845 (explaining removal of

non-native rainbow trout will "preserve (improve) the natural quality of wilderness

character that is currently degraded by the presence of a non-native species.");

AR015645 (explaining "non-indigenous fish" are unnatural and can have "far-

reaching negative effects on indigenous biological diversity."). Therefore, not only

does the removal of rainbow trout from the Buffalo Creek subwatershed promote

the conservation purpose of the Wilderness Act, but it also promotes the Absaroka-Beartooth Wilderness area's wilderness character.

>    **2.    The F&R correctly found that removal of rainbow trout from the Buffalo Creek subwatershed was necessary to the conservation of YCT and that the Project's authorized nonconforming uses were necessary to achieve that removal.**

The Wilderness Act provides that, "except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter . . . there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area." 16 U.S.C. § 1133(c). "Because the conservation of [YCT] is a valid purpose of the Wilderness Act, the relevant question is whether the [Forest] Service made an adequately reasoned determination of necessity." *Wilderness Watch*, 629 F.3d at 1036. An adequately reasoned determination of necessity requires the agency to explain first why otherwise prohibited actions "were necessary at all," and second why the specifically authorized actions were necessary. *Id.* at 1037. USFS did just this.

As USFS explained, hybridization of YCT with rainbow trout is the "primary threat" to the conservation of YCT throughout its range. SOF ¶ 3. Rainbow trout are spreading in the Lamar River watershed, increasing hybridization and threatening "the entire Lamar River population of cutthroat trout found in 352 stream miles in the basin." SOF ¶ 23. A recent study found that

20

"spatial patterns of invasion point to Buffalo Creek as the single contemporary source of rainbow trout in the (Lamar) watershed," and YCT in that watershed "will not be secure until the source of rainbow trout in Buffalo Creek is addressed." *Id.* As the F&R correctly found, "addressing genetic integrity is necessary for the conservation of YCT in the Lamar River watershed," and "it is further necessary to do so in Buffalo Creek." F&R 27; *see also id.* at 28 ("As USFS convincingly argues, the only means of securing YCT in the Lamar River watershed is to remove rainbow trout from Buffalo Creek.").

The F&R further correctly found that "[t]he contents of the administrative record reinforce USFS' determination that the Project's nonconforming activities are necessary for conservation of YCT." F&R 28. Removing the source population of rainbow trout through electrofishing and gillnetting is not possible "because they have limited effectiveness in deep and complex habitats found within the project area," and the "large amount of algae in Hidden Lake would quickly clog gill nets making them ineffective at catching fish." AR003905. Instead, application of rotenone is the only feasible method of eradicating rainbow trout from the Buffalo Creek subwatershed.[3] *Id.* And, as USFS explained, "some activities

_____

[3] Plaintiff confusingly argues that application of rotenone is not part of the necessity inquiry under section 1133(c). Obj. 14-16. But the necessity of using rotenone must be assessed before determining whether application of rotenone requires nonconforming uses. The F&R correctly considered this issue as part of that inquiry. *See* F&R 29.

21

prohibited by Section 4(c) of the Wilderness Act such as operating motorboats and motorized pumps, helicopter landings, and aerial spraying are essential in meeting project objectives." AR004007; *see also* AR003905 ("There are no nonmotorized methods for effectively applying rotenone to depth and across large open water expanses that exist in the project area."); AR002823 ("[T]he use of non-motorized equipment in the project area to support rotenone treatment was seriously considered but ultimately dismissed. Through the minimum requirements analysis process, it was determined that motorized use is necessary, and there are no non-motorized means that could achieve the project objective of a complete fish kill in the project area."); AR002830-31.

Having explained that otherwise prohibited activities were "necessary at all," the MRDG then explained why the approved activities were necessary by considering a spectrum of four action alternatives. This spectrum was bookended by an aircraft supported alternative and a pack and stock supported alternative, with an aircraft and stock supported alternative (with and without aerial restocking of YCT) in the middle. SOF ¶ 28. Relying on the detailed analysis in the MRDG, the Forest Supervisor found that the pack and stock supported alternative would not meet the project goals because it "greatly reduce[d] the likelihood of eliminating rainbow trout from the watershed," but that the aircraft supported alternative provided more helicopter landings than necessary. AR003908. Instead,

the Forest Supervisor determined that the aircraft and stock supported alternative without aerial restocking of YCT "maximizes traditional means of transportation when possible and minimizes the number of prohibited uses for the purpose of administering the Absaroka Beartooth Wilderness in compliance with the Wilderness Act." AR003909. The MRDG detailed why each nonconforming use, and the extent of each use, was necessary. SOF ¶ 30. The Forest Service ultimately approved this alternative. SOF ¶ 32. As the F&R explained, this decision fully complied with the Wilderness Act. F&R 28-32; *see Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192, 1208 (W.D. Wash. 2016), *aff'd*, 731 F. App'x 709 (9th Cir. 2018) (upholding decision where agency "considered the positive and negative effects of multiple alternatives and selected the option that in its expert opinion would affect wilderness the least").

Other than a single conclusory sentence, Plaintiff did not challenge USFS's detailed necessity determination in its motion for summary judgment. *See* Pl.'s Br. 22-23. Plaintiff now claims the Project authorizes "a stunning amount of intensive motorized and mechanical intrusion." Obj. 22. But Plaintiff does not even attempt to argue that application of rotenone is not necessary to remove all rainbow trout or that the authorized nonconforming uses are not necessary to apply the rotenone. *See* Obj. 22-24. Instead, Plaintiff continues to misconstrue the Wilderness Act as prohibiting the Forest Service from removing rainbow trout from the Buffalo

Creek subwatershed.[4] *Id.* As discussed above, the Wilderness Act contains no such

prohibition. Plaintiff's misunderstanding of the Wilderness Act in no way

undermines the Forest Service's detailed and fully supported necessity

determination.

In short, "Plaintiffs have not demonstrated that any project component

exceeds the minimum requirements necessary for the purpose of YCT

conservation. Instead, USFS has demonstrated that the project is necessary and

therefore meets the requirements of the exception in 16 U.S.C. § 1133(c)." F&R

32.

    **B.**    **Section 1133(c) does not apply to restocking YCT in the Buffalo Creek subwatershed and such restocking is consistent with the Wilderness Act's conservation purpose and the preservation of wilderness character.**

FWP's restocking of YCT in the Buffalo Creek subwatershed following

removal of rainbow trout does not require nonconforming uses under the

Wilderness Act. SOF ¶¶ 28-29, 32. As a result, section 1133(c) does not apply, and

the Forest Service was not required to assess whether any nonconforming uses

---

[4] Plaintiff's reference to USFS's "scoring" in the MRDG of each alternatives' potential effects on wilderness character to argue nonconforming uses were somehow unnecessary is misplaced. Obj. 24; *see* AR003907. This is just another way of arguing the Wilderness Act requires the Forest Service to take no action and to retain rainbow trout in Buffalo Creek. It does not. Further, as the MRDG explained, the long-term improvement to wilderness character from removal of rainbow trout outweighed "the short-term negative effects" of the approved nonconforming uses. AR003909.

were "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." 16 U.S.C. § 1133(c). The only issue as to the restocking is whether it is prohibited by some other provision of the Wilderness Act.[5]

The only reference in the Wilderness Act to wildlife management explains that nothing in the Act "shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in the national forests." 16 U.S.C. § 1133(d)(7). To be sure, this does not give a state limitless power to manage wildlife in wilderness areas. A state's "broad trustee and police powers over wild animals within their jurisdictions," does not allow a state to contravene federal law. *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). But restocking YCT in the Buffalo Creek subwatershed does not violate the Wilderness Act.

Plaintiff claims otherwise, arguing that restocking the area violates section 1133(b)'s requirement that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area."

---

[5] Defendant does not contend that Plaintiff is foreclosed from challenging restocking of YCT. The Final Decision Notice, however, did not need to separately authorize that restocking because a cooperative agreement between FWP and the Forest Service establishes that Forest Service approval is not required for FWP to stock fish "where established prior to [wilderness] designation" or to change the "fish species stocked in areas where stocking was established prior to designation." SOF ¶¶ 19, 32.

16 U.S.C. § 1133(b); Obj. 18. But, as discussed in section IV.A.1 above, this ignores the "competing" or "conflicting" instructions also found in section 1133(b) to manage wilderness areas for additional purposes, including conservation. *See Kofa*, 629 F.3d at 1033-34. Conservation of YCT in the Absaroka Beartooth Wilderness is a purpose of the Wilderness Act. And "[r]eplacing rainbow trout with genetically pure YCT in 46 wilderness stream miles in the Buffalo Creek drainage presents the single greatest opportunity in the Yellowstone Headwaters Subbasin for establishing a genetically pure YCT metapopulation, secure above a natural barrier, from hybridization, disease, disturbance, and climate threats." SOF ¶ 26. Establishing a population of genetically pure YCT secure from introgression is fully consistent with the Wilderness Act's conservation purpose.[6]

Further, even if preservation of wilderness character were the sole aim of the Wilderness Act, the Forest Service reasonably determined that restocking the

---

[6] Plaintiff claims the purpose of restocking YCT is "in large part to benefit sport fishing." Obj. 19. This is wrong. Although FWP explained that YCT restocking would provide for the continuation of recreational fishing in the area, AR002808, this is an incidental effect that does not violate the Wilderness Act. *See Wilderness Soc'y*, 353 F.3d at 1064-65 (assessing Wilderness Act compliance by looking at project's "primary purpose," "principal aim," and "primary effect"); *Californians for Alternative to Toxics*, 814 F. Supp. 2d at 1016 (relying on "stated" fish restoration purpose of project). Further, even if maintaining recreational fishing opportunities were a primary purpose of the Project, such a purpose would still be consistent with the Wilderness Act's "public purposes of *recreational*, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b) (emphasis added).

Buffalo Creek subwatershed with YCT would promote the area's wilderness
character. Plaintiff challenges this determination, claiming the Buffalo Creek
subwatershed was naturally fishless due to the barrier cascade to argue otherwise.
Obj. 15, 18. This argument is misplaced.

Although the area above the barrier cascade on Buffalo Creek was *presumed*
fishless at the time of European colonization, this presumption "is a best guess that
reflects a minute fraction of the time Yellowstone cutthroat trout swam waters in
their historical range." SOF ¶ 21. But Buffalo Creek is within the YCT's historic
range within the Yellowstone drainage where it is "hypothesized" that most
streams were occupied by YCT. SOF ¶ 1. "Yellowstone cutthroat trout have a long
history in the Snake and Yellowstone River watersheds, which has included much
of current day Yellowstone National Park and the Absaroka-Beartooth Wilderness,
including the Buffalo Creek watershed." AR009195.

Thus, "[s]pecies present in the project area coevolved with YCT elsewhere
in their historical ranges, including lower Buffalo Creek." AR003842. The Project
would therefore "result in the establishment of a coevolved community of fish,
invertebrates, and amphibians within the climate shield, and remove a species that
did not co-evolve, which would bring considerable conservation benefit over its
existing state." *Id.*; *see also* AR002676. In short, whether YCT were present in
specific reaches of the Buffalo Creek subwatershed at the time of European

27

colonization, the Forest Service reasonably determined that stocking the subwatershed with YCT that are native to the Yellowstone drainage ecosystem preserves the wilderness character of the area.

And more fundamentally, Plaintiff's Edenic view of wilderness never existed in fact and is not required by the Wilderness Act. The Buffalo Creek subwatershed was not fishless when Congress designated the Absaroka-Beartooth Wilderness. Both YCT and rainbow trout had been stocked there before wilderness designation. SOF ¶¶ 11, 22. And despite this pre-designation human intervention, Congress determined the area met the Wilderness Act's definition of wilderness. Were that not the case, the area would not have qualified for inclusion in the National Wilderness Preservation System. By designating the area as wilderness, Congress made clear that the presence of fish in the Buffalo Creek subwatershed was consistent with the wilderness character of the area *as defined in the statute* (as opposed to Plaintiff's preferred extra-statutory primordial definition of wilderness). Restocking the area with YCT native to the wilderness area and that coevolved with other species in that area only improves the area's wilderness character. Plaintiff's claims to the contrary are supported by neither fact nor law.

## V.    CONCLUSION

For the reasons stated above, the Court should overrule Plaintiff's objections to the F&R, deny Plaintiff's motion for summary judgment, and grant Defendant's cross-motion.

Respectfully submitted on this 25th day of April, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney, CA Bar No. 254564
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Telephone: (202) 532-5973
shaun.pettigrew@usdoj.gov

*Attorney for Defendant*

29

**<u>CERTIFICATE OF COMPLIANCE</u>**

Under Local Rules 7.1(d)(2) and 72.3(a)(3), I hereby certify that the foregoing brief contains 6,467 words, excluding caption, certification of compliance, table of contents and authorities, and certificate of service.

<u>/s/ <i>Shaun M. Pettigrew</i>   </u>
Shaun M. Pettigrew
*Attorney for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will provide service to counsel for the parties.

<u>/s/ <i>Shaun M. Pettigrew</i>   </u>
Shaun M. Pettigrew
*Attorney for Defendant*
