IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDERNESS WATCH, | CV 23–133–M–DWM |
| Plaintiff, | |
| vs. | AMENDED ORDER |
| UNITED STATES FOREST SERVICE, | |
| Defendant. | |

Plaintiff Wilderness Watch has brought a Wilderness Act challenge to the United States Forest Service's (the " Forest Service") authorization of the Buffalo Creek Yellowstone Cutthroat Trout Conservation Project (the "Buffalo Creek Project" or the "Project") in the Custer Gallatin National Forest and Absaroka-Beartooth Wilderness. That Project authorizes the agency to use mechanized and motorized means to apply poison to 45.5 wilderness stream miles to eradicate rainbow trout and replace them with Yellowstone cutthroat trout. *See* AR002669. Wilderness Watch argues that the Project "unlawfully elevates managers' desired outcomes above the Wilderness Act's 'untrammeled' mandate" by authorizing "a stunning amount of intensive motorized and mechanical intrusions and other prohibited activities into the Wilderness . . . to poison miles of streams and wetlands in a remote watershed." (Doc. 34 at 5.) Wilderness Watch is correct.

1

The parties filed cross-motions for summary judgment, (Docs. 15, 20), and a motion hearing was held before United States Magistrate Judge Kathleen L. DeSoto on December 18, 2024, (*see* Doc. 30 (Min. Entry)).  On March 21, 2025, Judge DeSoto entered Findings and Recommendations, recommending that summary judgment be granted in favor of the Forest Service.  (Doc. 31.) Wilderness Watch filed objections, (Doc. 34), triggering de novo review of the identified portions of the Findings and Recommendations, 28 U.S.C. § 636(b)(1). Those objections are addressed individually below.  The Findings and Recommendations are otherwise reviewed for clear error.  *See Thomas v. Arn*, 474 U.S. 140, 154 (1985); *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000). Because Judge DeSoto provided a complete background of the Project, (*see* Doc. 31 at 2–7), it is not restated here.

## ANALYSIS

Challenges to agency action based on the Wilderness Act are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.  See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003).  Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency

2

has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the scope of judicial review is narrow and a court should "not substitute its judgment for that of the agency." *Id.*

Under the Wilderness Act, the Forest Service is "responsible for preserving the wilderness character of an area" and must "administer such area for such other purposes for which it may have been established as also to preserve its wilderness character[,]" which includes "recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b). The Act prohibits the construction of roads, the use of motorized vehicles and mechanical equipment, and installations of structures "except as necessary to meet the minimum requirements for the administration of the area for th[ose] purpose[s]." *Id.* § 1133(c). Consistently, to engage in these prohibited activities within a wilderness area, an agency must first identify a valid "purpose" under the Act. *Wilderness Watch, Inc. v. U.S. Fish and Wildlife Serv. ("Kofa")*, 629 F.3d 1024, 1032 (9th Cir. 2010). It must then show that the prohibited activity is "necessary"

3

to meet the "*minimum* requirements for the administration of the area" for that

identified purpose. *Id.* at 1037.

Here, Judge DeSoto found that the Forest Service met its Wilderness Act

mandate in approving the Buffalo Creek Project under this two-step framework.

(*See* Doc. 31.)  Wilderness Watch objects to that analysis, specifically challenging

(1) Judge DeSoto's interpretation of *Kofa*, (2) her comparison of this case to the

facts of *Kofa*, (3) her analysis of fish poisoning and fish stocking under the *Kofa*

framework, and (4) her deference to the agency to the agency's ultimate

conclusion.  Having reviewed those objections de novo, 28 U.S.C. § 636(b)(1), and

the remainder of the Findings for clear error, *Thomas*, 474 U.S. at 154, the

Findings and Recommendation are adopted in part, rejected in part, and modified

as reflected below.

## I.    Interpretation of *Kofa*

Wilderness Watch first argues that Judge DeSoto erred by incorrectly

interpreting the Wilderness Act by suborning the "wilderness character" mandated

by the Act to competing uses.  The Wilderness Act provides that "each agency

administering any area designated as a wilderness shall be responsible for

preserving the wilderness character of the area and shall so administer such area

for such other purposes for which it may have been established as also to preserve

its wilderness character . . . . [W]ilderness areas shall be devoted to the public

4

purposes of recreational, scenic, scientific, educational, conservation, and historical

use." 16 U.S.C. § 1133(b). Because these mandates reflect "competing" interests,

agencies must apply their "judgment and discretion" in managing these areas.

*Kofa*, 629 F.3d at 1033–34.

Here, Wilderness Watch argues that Judge DeSoto erred by finding that,

under *Kofa*, "a valid purpose under the Wilderness Act may be found either in the

preservation of wilderness character *or* in the list of uses enumerated in 16 U.S.C.

§ 1133(b)." (Doc. 31 at 12.) That objection has merit. *Kofa* makes clear that the

requirements under § 1133(b) are conjunctive, *see* 629 F.3d at 1034 (explaining

that an agency "must preserve the wilderness character of the area *while at the*

*same time* providing for 'recreational, scenic, scientific, educational, conservation,

and historical use.'" (emphasis added)), and the plain language of the Act places a

thumb on the scale in favor of preservation, *see* 16 U.S.C. §§ 1131(a), 1133(b).

That preference is reflected in the agency's own guidance regarding management

under the Wilderness Act, *see* AR015614 ("Section 4(b) of the Wilderness Act

gives the primary and affirmative management direction for wilderness."), and the

congressional record regarding the Act's passage , *see* AR015614 ("The overriding

principle guiding management of all wilderness areas, regardless of which agency

administers them, is the Wilderness Act (Section 4(b)) mandate to preserve their

wilderness character.").

Accordingly, Judge DeSoto's findings are modified to clarify that the Wilderness Act mandates the managing agency "preserve wilderness character" even if it acts to further other enumerated purposes. *See Kofa*, 629 F.3d at 1034; *see* AR010782 ("[Federal land] managers should allow for and even promote these public uses of wilderness, but they cannot allow such uses to detract from the wilderness resources itself. Preservation of wilderness is the paramount obligation.").

## II.    Wilderness Purpose

Wilderness Watch further challenges the determination that the conservation of Yellowstone cutthroat trout is a valid conservation purpose under the Act, objecting to Judge DeSoto's reliance on *Kofa* on the grounds that *Kofa* was factually distinguishable in both terms of why the wilderness area at issue was designated and in the perceived benefits of the Project. Both objections have merit.

Wilderness Watch first insists that *Kofa* is factually distinguishable because while there is no historical connection between the creation of the Absaroka-Beartooth Wilderness and Yellowstone cutthroat trout, the "[p]reservation of bighorn sheep in the area was one of the principal motivations for President Roosevelt's establishing the [Kofa National Wildlife Refuge]." 629 F.3d at 1035. That objection is supported by the record. Wilderness Watch is correct that, unlike

6

the big horn sheep in *Kofa*, the preservation of Yellowstone cutthroat trout was not

central to the designation of the Absaroka-Beartooth Wilderness. Indeed, the

Yellowstone cutthroat trout is only referenced once in the legislative history, when

Senator Lee Metcalfe, the bill's sponsor, commented on the "many species of

wildlife that require an essentially wilderness environment to prosper." (Doc. 25-4

at 1.) To be sure, the legislative documents show that lawmakers were interested

in protecting the watershed and fisheries, but not specifically the Yellowstone

cutthroat trout in Buffalo Creek. For example, the bill proposing the Absaroka-

Beartooth Wilderness stated that "the wilderness will provide protection for major

watersheds flowing south into the park" and that "[t]he Yellowstone ecosystem . . .

has been described as the best sport fishing area in the entire continent." (Doc. 25-

2 at 1–2.) It further indicated that the area contained "three major streams and five

lakes with trout fisheries." (*Id.* at 7.) Similarly, the Senate described the area as "a

major quality watershed for the Yellowstone River, one of America's finest blue-

ribbon trout streams." (Doc. 25-3 at 1.)

The absence of Yellowstone cutthroat trout from the wilderness designation

record makes some sense given the fact "that Buffalo Creek upstream of the . . .

Wilderness boundary was [likely] fishless at the time of European colonization"

and was only recently stocked with both Yellowstone cutthroat trout (1920s and

1942) and rainbow trout (1932). AR002606. While the Forest Service has

consistently cooperated with other land and wildlife management agencies to conserve and protect the Yellowstone cutthroat trout in the Yellowstone River system more broadly, *see* AR002611; *see also* AR002598, such actions have not been focused in the wilderness area. Reestablishment of a native species may be a valid conservation purpose under the Wilderness Act. *See Californians for Alternatives to Toxics v. U.S. Fish & Wildlife Serv.*, 814 F. Supp. 2d 992, 1015–16 (E.D. Cal. 2011). But here there is a disconnect in the record between that purpose and this wilderness stream.

Wilderness Watch's second objection further highlights this disconnect. Wilderness Watch argues that unlike *Kofa*, where the project activities sought to benefit bighorn sheep in the wilderness area, the Buffalo Creek Project was selected merely because of the positive benefits it will have for fisheries and recreation outside the wilderness area. According to Wilderness Watch, "[t]he Forest Service selected the most wilderness-degrading alternative . . . to pursue speculative conservation outcomes outside the Absaroka-Beartooth Wilderness." (Doc. 34 at 17.) The EA emphasizes the contributions of the Yellowstone cutthroat trout to the ecosystem and the recreational fishing opportunities in the Yellowstone River watershed. *See, e.g.*, AR002604 ("Yellowstone cutthroat trout embody much of what makes the Absaroka-Beartooth Wilderness and Yellowstone National Park special."). But those platitudes once again ignore the fact that within

8

the wilderness area, Buffalo Creek was historically fishless, so the wilderness neither depended on Yellowstone cutthroat trout for ecological balance nor contributed them to the watershed as a whole. As a result, conserving them serves no wilderness purpose.

As explained by Judge DeSoto, because the Wilderness Act's use of the term "conservation" is ambiguous, the agency's decision is entitled to respect based on the persuasiveness of its justification. (*See* Doc. 31 at 17–19 (discussing "*Skidmore*" deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).) Whether an agency's interpretation has the "power to persuade . . . depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning," and "its consistency with earlier and later pronouncements." *Skidmore*, 323 U.S. at 104. On this record, such persuasiveness is absent. While downstream benefits and current wildlife management priorities may support the decision to propose a project in the first place, they alone do not make a purpose valid under the Wilderness Act. Accordingly, the conservation of Yellowstone cutthroat trout in Buffalo Creek is not a valid conservation purpose under the Act.

## III.   Rotenone Poisoning and Fish Stocking

In her analysis, Judge DeSoto considered rotenone poisoning in the context of *Kofa*'s second step (i.e., necessity), (*see* Doc. 31 at 29), and did not analyze fish stocking because Montana Fish, Wildlife and Parks would "stock" the Yellowstone

9

cutthroat trout using primitive methods after the Project was executed, (*see id.* at

31).  Wilderness Watch argues that because fish poisoning and stocking are not

prohibited activities under § 1133(c) but nonetheless have the potential to impact

wilderness character, both the Forest Service and Judge DeSoto should have

analyzed these actions under the broader mantle of the Forest Service's duty to

preserve wilderness character as outlined in § 1131(a) and § 1133(b).  That

argument is compelling.  The Forest Service was required to consider whether the

management actions of rotenone poisoning and fish stocking—as opposed to just

their means of implementation—would preserve the wilderness character in the

area prior to approving the Project.  The record shows that in doing so, the agency

"relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, [and] offered an explanation for its

decision that runs counter to the evidence before the agency."  *Motor Vehicle*, 463

U.S. at 43.

## A.    Fish Stocking

Wilderness Watch's objection raises the threshold question of whether the

Forest Service was required to consider fish stocking in its management of the area

"to preserv[e] wilderness character" under § 1133(b).  It was.  The Wilderness Act

states that it should not "be construed as affecting the jurisdiction or

responsibilities of the several States with respect to wildlife and fish in the national

forests." 16 U.S.C. § 1133(d)(7).  And here, the Project itself does not authorize

fish stocking activities because those activities are to be performed by the state

wildlife agency using primitive means after the Project is executed.  *See*

AR002598, 2678.  Nonetheless, actions that occur in the wilderness but are not

executed by federal land managers still impact the wilderness character of an area,

*see* AR015642, 15709, and the federal government has authority over wildlife on

federal land, *see Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) (explaining that

state powers over wildlife "exists only in so far as their exercise may not be

incompatible with, or restrained by, the rights conveyed to the federal government

by the constitution" (cleaned up)).

Moreover, the plan to restock Buffalo Creek with Yellowstone cutthroat

trout is not incidental to the Project, but rather central to the Project's chosen

alternative.  While the Project's approval is limited to the removal of rainbow trout

from the Buffalo Creek watershed, the conservation purpose identified by the

agency is the conservation of the Yellowstone cutthroat trout and the agency's

analysis is couched entirely in terms of the "outstanding ecological, historical, and

recreational value" of native Yellowstone cutthroat trout.  *See* AR002596–98,

2603.  Indeed, the Forest Service rejected an alternative that would have removed

rainbow trout from Buffalo Creek and left the area "fishless."  AR002628, 2678–

79.

Accordingly, the Forest Service was required to consider whether fish stocking in the wilderness area was consistent with preserving its wilderness character. Because it failed to do so, its decision is arbitrary and capricious.

## B.     Wilderness Character

The Wilderness Act defines "wilderness" as

> an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). In managing to preserve "wilderness character," agencies have identified five "qualities" that "represent the primary tangible aspects of wilderness character that link on-the-ground condition in wilderness and the outcomes of wilderness stewardship to the statutory definition of wilderness." AR015616. Those qualities are: Untrammeled, Natural, Undeveloped, Solitude or Primitive and Unconfined Recreation, and Other Features of Value. *See* AR015616–18. "[A]ll five qualities are of equal importance . . . . However, all five

qualities do not carry equal weight in determining the overall trend in wilderness character . . . ." AR015618.

The two qualities at issue here, Untrammeled and Natural, consistently give rise to management dilemmas. "The Untrammeled Quality is preserved or sustained when action to intentionally control or manipulate components or processes of ecological systems inside wilderness (for example, suppressing fire, stocking lakes with fish, installing water catchments, or removing predators) are not taken." AR015617. On the other hand, "[t]he Natural Quality is preserved when there are only indigenous species and natural ecological conditions and processes, and may be improved by controlling or removing non-indigenous species or by restoring ecological conditions." AR015617. The tension between these two qualities is apparent in both fish poisoning and fish stocking. Both actions are manipulations of the wilderness (trammeling) that seek to restore a native fish species (natural condition). Thus, while these actions degrade the Untrammeled Quality, they arguably enhance the Natural Quality.

Here, the Forest Service recognized that both rotenone treatment and fish stocking are "trammeling actions" because they "manipulate[] an ecological system." AR002675; *see also* AR015708–09 (discussing how both the use of poison and stocking fish are examples of trammeling action, whether executed by a federal agency or not). However, the agency determined that "[o]ver the long-

13

term, rotenone application would improve the natural quality of wilderness character by replacing a nonnative and functionally invasive fish species that is not endemic to the Absaroka-Beartooth Wilderness with the native species indigenous to the project area in the Absaroka-Beartooth Wilderness, thus establishing the natural aquatic community of fish, invertebrates, and amphibians that coevolved in the Greater Yellowstone Ecosystem." AR002676. Thus, according to the Forest Service, poisoning the rainbow trout and restocking the area with Yellowstone cutthroat trout will improve the area's wilderness character. *See* AR002597. That conclusion runs counter to both agency guidance and the record in the case.

In recognition of the fact that "[p]rotecting one quality of wilderness character may diminish another," AR015619, agency guidance places the thumb on the scale in favor of maintaining the Untrammeled Quality, making it a "first among equals," AR015633; *see also* AR015691. That is not reflected in the Forest Service's decision here; rather, the Forest Service has elevated the "Natural Quality" above all other considerations. But even in the context of enhancing an area's "Natural Quality," agency guidance indicates that managing for wilderness character is not intended "to stop change, nor recreate conditions as of some arbitrary historical date nor to strive for more favorable change in big game populations or scenic vistas. The object is to let nature 'roll the dice' and accept the results with interest and scientific curiosity." AR015639. Consistently,

14

"[r]estraint is at the core of the new valuation of wilderness as a moral resource."
AR015639. Accordingly, "the Natural Quality should not be used to recreate
historical conditions from an arbitrary point in time (such as pre-European
settlement or the date of wilderness designation), target a subjective set of desired
conditions (such as the population of a specific game species), or otherwise
maintain unchanging ecological conditions." AR015715.

Here, the Forest Service acknowledged that "that Buffalo Creek upstream of
the . . . Wilderness boundary was [likely] fishless at the time of European
colonization," and was only recently stocked with both Yellowstone cutthroat trout
(1920s and 1942) and rainbow trout (1932). AR002606. Both facts are important
here. First, Buffalo Creek was historically *fishless*. Thus, as discussed above, the
Forest Service's principal claim that it is restoring a native species to the
wilderness area has a serious caveat. Second, *both* rainbow trout and Yellowstone
cutthroat trout were stocked in Buffalo Creek prior to the designation of the
Absaroka-Beartooth Wilderness. Because those actions predate designation, they
are not considered "trammeling," AR015646, 15709, and the presence of both
species is part of the "baseline condition" of the wilderness area, AR015624–25.[1]

_____

[1] Confusingly, the EA states at one point that Yellowstone cutthroat trout "are
considered indigenous to the project area in [sic] because they were stocked in the
Buffalo Creek drainage within the Absaroka Beartooth Wilderness in the 1920's
(Yellowstone Lake origin) and in 1942 (Montana State Fish Hatchery origin), prior

It is unclear how the elimination of one of those species in favor of another, in a stream neither originally inhabited, preserves either the "primeval" wilderness character, 16 U.S.C. § 1131(c), or the baseline wilderness character at the time of designation, AR015624–25. Rather, as argued by Wilderness Watch, "[t]his is not ecological restoration—it is continued manipulation." (Doc. 34 at 24.)

Unlike other resource management statutes, the Wilderness Act is not merely a procedural checklist or a delegation of discretion to a managing agency to weigh competing uses; the Wilderness Act mandates the preservation of wilderness character. By failing to consider whether the actions of fish poisoning or fish stocking serve that mandate, the Forest Service's decision to approve the Project was arbitrary and capricious.

## VI.   Deference to the Ultimate Conclusion

Finally, Wilderness Watch further objects to the Findings on the ground that Judge DeSoto improperly deferred to both the Forest Service's assessment of "necessity" under the step two of the *Kofa* test and, more broadly, to the Forest Service's approach to the Wilderness Act. According to Wilderness Watch, "the Court gave undue weight to the agency's preference for efficiency and project success at the expense of its statutory duties to preserve wilderness character. A

---

to the 1978 designation of the [Absaroka Beartooth] Wilderness." AR002674. But if that were case, rainbow trout would have an equal claim.

project that by every score degrades the wilderness character cannot be deemed 'necessary to meet minimum requirements' for protecting that Wilderness or be in line with the agency's mandate to preserve wilderness character." (Doc. 34 at 28.) That objection also has merit. The prohibition on motorized and mechanized vehicles and equipment "is one of the strictest prohibitions in the Act." *Californians for Alternatives*, 814 F. Supp. 2d at 1016. "The limitation on the Forest Service's discretion to authorize prohibited activities only to the extent necessary flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." *Id.* (quoting *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 647 (9th Cir. 2004)). "Indeed various district courts in this circuit have concluded that the overall language of § 1133, along with case authority, imply that when there is a conflict between maintaining the primitive character of the area and between any other use, the general policy of maintaining the primitive character must be supreme." *Id.* (cleaned up).

Under the chosen alternative, rotenone treatment would occur over two to five years "at an intensity of up to two weeks per year in late August or early September." AR003857, 3890, 3898. A helicopter would be used to transport 4,923 pounds of equipment and supplies to the project area. AR003887, 3897. This would include large metal bear proof containers to secure all attractants (rotenone, food, and garbage). AR003887, 3897. To apply the poison,

> [r]otenone application would occur in a stepwise fashion progressing from the headwaters of the upper Buffalo Creek Subwatershed downstream to the Yellowstone National Park boundary over the course of approximately seven days (Figures 3, 4). This would require up to 20 personnel per day operating in the AB Wilderness over the duration of the project. On day two through four, the headwaters downstream to the upper meadow would be treated.
>
> Rotenone treatment of Hidden Lake, the upper Meadow and connected tributary streams would occur approximately on days four through six (middle treatment). On days seven and eight, rotenone treatment would progress downstream through the lower meadow to fish barrier falls downstream from the Yellowstone National Park boundary (Lower Treatment).

AR003857, 3890, 3898. Overall, the chosen alternative approves up to 15 helicopter landings per year on four separate days. AR003889. In total, the Project authorizes up to 81 aircraft landings in the wilderness. AR002826, 3897. Aircraft would also be used to aerially spray certain areas and either gasoline- or battery-powered injector pump systems would be used to dispense rotenone from boats in others. AR003865, 3890, 3898. A motorboat would be used to dispense the rotenone on Hidden Lake, AR003865, 3890, and fish barriers would be constructed using material wrapped in irrigation tarp, AR002824–25, 3889, 3897. The Project also permits dyes be placed in the stream to monitor flows, approval of a radio repeater for communication, use of gas-powered generators, and the establishment three camps for personnel. *See* AR003860–65, 3886–89, 3897, 3908.

Recognizing the incredible impact these prohibited activities would have on the wilderness area, the Forest Service determined in its Minimum Requirements Decision Guide that the Project would have an overall negative impact on wilderness character:

| Summary Ratings for Alternative 5 | |
|---|---|
| **Wilderness Character** | |
| Untrammeled | -3 |
| Undeveloped | -7 |
| Natural | +3 |
| Solitude or Primitive & Unconfined Recreation | -8 |
| Other Features of Value | 0 |
| **Wilderness Character Summary Rating** | **-15** |

AR003904–05. But the agency concluded that the Project complied with the Wilderness Act anyway. Because that decision "runs counter to the evidence before the agency," it is arbitrary and capricious. *Motor Vehicle*, 463 U.S. at 43.

As discussed above, the Wilderness Act is not simply a procedural hurdle that can be overcome by considering all the relevant factors that bear on wilderness character. To the contrary, the Act dictates the outcome: wilderness areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas[ and] the preservation of wilderness

character . . . ." 16 U.S.C. § 1131(a). A Project that diminishes wilderness

character on almost every level cannot meet that requirement.

## III.    Conclusion

Based on the foregoing, and having reviewed the rest of the Findings for

clear error,

IT IS ORDERED that:

(1)  The Findings and Recommendation, (Doc. 31), are ADOPTED IN

PART, REJECTED IN PART, and MODIFIED as reflected above.

(2)  Wilderness Watch's motion for summary judgment (Doc. 15) is

GRANTED and the Forest Service's motion (Doc. 20) is DENIED.

(3)  The Forest Service's August 3, 2023 Decision Notice is VACATED.

The matter is REMANDED to the agency for further review consistent with this

Order.

(4)  The Clerk is directed to enter judgment consistent with this Order and

close the case file.

DATED this 24 day of October, 2025.

08:57 A.M.

Donald W. Molloy, District Judge
United States District Court